No. 19,482.

THE STATE OF KANSAS, *Appellee,* v. H. A. YEATER, *Appellant.*

SYLLABUS BY THE COURT.

1. GENERAL REPUTATION—*Cross-examination as to Derogatory Reports—Negative Answers Final.* Where a witness testifies that the defendant has a good general reputation for peace and quietness, and upon cross-examination is asked if he has not heard reports of particular quarrels or acts of violence in which the defendant participated to which the witness returns a negative answer, the defendant is not then entitled to offer testimony to show that the quarrels or acts of violence spoken of never occurred.

2. AFFRAY—*Exclusion of Certain Evidence Not Error.* No error is committed in excluding testimony as to the conclusions of a witness that certain persons engaged in an affray with the defendant appeared to witness to be "trying to get hold of him to get him down."

3. MANSLAUGHTER—*No Error in Instructing Relative to Higher Degrees of Homicide.* The defendant, who was charged with murder in the second degree and convicted of manslaughter in the third degree, complains of instructions that were submitted to the jury upon the higher degrees of homicide. *Held,* that he suffered no prejudice from the instructions as to the degrees of the offense of which he was acquitted, and, further, that there was testimony in the case which warranted the submission of instructions on the higher degrees.

4. EVIDENCE SUSTAINS THE VERDICT. The evidence in the case is held to be sufficient to support the verdict finding the defendant guilty of manslaughter in the third degree.

Appeal from Morris district court; ROSWELL L. KING, judge. Opinion filed April 10, 1915. Affirmed.

*M. B. Nicholson, W. J. Pirtle,* both of Council Grove, *E. J. Sheldon,* and *S. J. Shively,* both of Paola, for the appellant.

*S. M. Brewster,* attorney-general, *John L. Hunt,* assistant attorney-general, and *Clarence A. Crowley,* county attorney, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: H. A. Yeater was convicted of manslaughter in the third degree for the killing of Archie Capps, and appeals.

On August 9, 1913, Yeater, a robust man about thirty-one years of age, and Harry Capps, who was about sixteen years of age, were both employed by the Missouri Pacific Railway Company at Council Grove, Yeater at the roundhouse as an engine-crew caller and Harry Capps at the passenger depot as a train-crew caller. It appears that at about eleven o'clock of that night Harry Capps called Yeater on the telephone to inquire about a certain engine crew, and Yeater answered him in a rather rough and profane manner. Capps reported Yeater's action to Mr. Bowers, the night foreman at the roundhouse, who was a brother-in-law of Yeater, and shortly afterward Yeater went to the depot and demanded, as it is claimed, that Harry Capps go to the foreman and repudiate the complaint he had made. Capps refused to do so, and as he started to leave the depot Yeater followed and seized and pushed him about, and while they were quarreling over the matter Archie Capps, Harry's brother, who was about twenty years of age, came up and inquired of Harry the reason for the quarrel. Being told by him that Yeater wanted him to "go over and lie to Bowers," Archie entered into the discussion, and as Harry started to the well to get a drink Archie was heard to say, "Come on and whip him," or some such expression.

In the fighting which immediately followed and in which all three of them participated Archie Capps was cut by Yeater upon the upper and left side of the abdomen, puncturing and lacerating the peritoneum, and causing his death on August 14, 1913. On the trial it was contended that Yeater acted in self-defense, and that he was only protecting himself from the assaults of the Capps brothers when he inflicted the wounds upon Archie Capps. He introduced evidence tending to show that he was a man of good character and reputation and had not been in trouble before. The jury found Yeater guilty of third-degree manslaughter, and from the judgment of conviction he appeals.

The first assignment of error is the exclusion of testimony offered to show that the defendant had never attacked the witness or had trouble with him. A number of witnesses had testified in favor of defendant to the effect that he had the reputation of being a peaceable, quiet and law-abiding citizen, and one of them was asked on cross-examination if he had not heard of a quarrel between defendant and Adkins as well as with some others named, and he replied that he had not. Later Adkins was called by the defendant as a witness, and was asked if defendant had ever chased him around the engine house with a knife in his hand. An objection to the question was sustained. The defendant says the inquiry as to quarrels with Adkins and others had suggested to the jury that there had been such quarrels, and that he desired and was entitled to show that no such quarrels had occurred. No error was committed in sustaining the objections and in refusing to enter upon a trial of these collateral issues. The subject of inquiry was the general reputation of the defendant in the community for peace and quietness. Witnesses stated that it was good, and their statements were then tested on cross-examination by asking them if they had not heard people speak of certain actions of the defendant that were disorderly and

violent.   While a witness who has testified as to reputation may not be cross-examined as to his own knowledge of specific acts and derelictions of the person, it is permissible to ask him if he has not heard reports of acts or doings that were inconsistent with the good reputation which the witness had attributed to such person. (*The State v. McDonald*, 57 Kan. 537, 46 Pac. 966.)   In this case the testimony in chief and on cross-examination related to the subject of reputation or what people said of the defendant, and not to the personal knowledge or opinion of the witnesses as to his conduct.   Of course, this right of inquiry should not be abused by insinuating that reports were current for which there was no basis, but it can not be said that the questions were not asked in good faith, nor that the right was abused in this instance.   It appears that no objections were made by the defendant to the questions asked by the state, nor were any motions made to strike out the answers that were given.   Even if the inquiry was extended too far or was wholly unwarranted it would not justify the introduction of testimony which was clearly outside of the subject of the defendant's reputation and which related to specific acts of his which were wholly collateral to the issues on trial.   If anything extraneous or irrelevant is brought into a case it should be struck out and the jury instructed that no consideration be given to it.   When the defendant undertook to introduce testimony of specific acts for the purpose of overcoming any effect that might have resulted from the inquiries as to reports of defendant's misconduct the court stated that the jury would be instructed on that phase of the case.   In its instructions the court did say to the jury that:

"Statements made by attorneys in the course of the trial or the assumption of any fact in any question asked of a witness and which is not supported by any evidence should not be considered by you."

The next assignment of error is the striking out of the testimony of a witness in regard to the affray where he said:

"It looked to me as though they [the Capps boys] were trying to get hold of him [the defendant] to get him down."

This was a mere conclusion of the witness. The acts of the Cappses might have been described and stated instead of the inferences and conclusions of the witness as to what they were trying to do. It belonged to the jury to draw the inferences from the testimony as to the purpose of those engaged in the fight. However, the ruling, if it had been erroneous, was of no materiality, as the witness was subsequently allowed to testify what the Cappses did and also what they appeared to be trying to do during the fight.

There is a contention that the evidence in the case did not warrant the court in instructing the jury as to the offenses of murder in the second degree and manslaughter in the first and second degrees, and it is further contended that under the evidence the defendant was not guilty of any offense and that the stabbing and killing of Archie Capps was done by the defendant in self-defense and was justifiable. In view of the testimony in the case it would be very difficult to demonstrate that the court was not warranted in submitting instructions as to the higher degrees, but, however that may be, the defendant was convicted of manslaughter in the third degree, and having been acquitted of the higher degrees charged he suffered no prejudice from the instructions complained of and has no good reason to complain.

The contention of the defendant that there is a lack of evidence to sustain the finding of the jury can not be sustained. It is insisted in his behalf that the Cappses were the aggressors, that they not only attacked but pursued him until he was compelled to use the knife upon them, and that at the time it was used he was in

imminent and immediate danger of great bodily harm. On the other hand it is the claim of the state, and there is testimony to sustain it, that it was the defendant who brought on the difficulty which resulted in the death of Archie Capps. His attitude towards the boy Harry Capps in the depot was hostile and menacing. He used threatening and abusive language, and when Harry started to leave him and go outside the defendant followed, grabbed hold of Harry, pushed and shoved him about, drew back his clinched fist and applied vile epithets to him. About that time Archie came up and inquired as to the cause of the quarrel and was told by Harry that defendant was trying to make him lie to Bowers, the foreman at the roundhouse. There is testimony that Archie then said that he had stood it as long as he could and to "come on and whip him." Another witness said that Archie's statement was, "We are enough for him." Another testified that Archie's statement was, "There is enough of us here to settle this; come on, Harry, we will fix him." There is much in the testimony which warrants the inference that the fight which ensued was only a continuation of the quarrel which the defendant provoked and which was not ended until Archie was stabbed by the defendant. It is true that it was a two-to-one fight, but the Cappses were young and immature while the defendant was a large, robust man, thirty-one years old, and, besides, it is testified that the younger of the boys took no part in the fight except when defendant got his brother down. It was fairly a question for the jury whether the defendant provoked the affray and also whether there was a necessity to use a knife, or, rather, whether the defendant was under a reasonable belief that he was in imminent danger of great bodily harm when the knife was used. The general rule is that self-defense is not available to one who provokes an affray in which a homicide is committed unless he withdraws from the

The State v. Yeater.

combat and indicates to his opponent a desire for peace. It has been said that:

"It is not enough to justify or excuse the homicide that in the course of the difficulty it became necessary for defendant to kill the deceased in order to save his own life or prevent great bodily harm; but he must also have been free from fault in provoking or continuing the difficulty which resulted in the killing. In such case defendant is guilty of murder or manslaughter." (21 Cyc. 805.)

Even if the Capps should be regarded as the aggressors in the difficulty it would not necessarily justify the defendant in taking the life of either assailant. The jury may have inferred from the evidence that defendant had no reasonable ground for the belief that there was a necessity for him to kill Archie in order to save himself from death or great bodily harm and that he did not in fact have such belief. In *The State v. Rogers,* 18 Kan. 78, 26 Am. Rep. 754, it was held, in effect, that a blow with the hand unaccompanied by anything to indicate a desire to kill or do great bodily harm does not justify the one assailed in the killing of an assailant although the former may have retreated and the latter did not indicate an abandonment of the conflict. In deciding the case it was further said:

"The authorities uniformly hold that the person who first commences a malicious assault, then continues to advance as the assailed retreats, or does not in good faith attempt, so far as he can, to withdraw from the combat, and abandon the conflict, can not justify taking the life of his adversary, however necessary it may be to save his own, and must be deemed to have brought upon himself the necessity of killing his fellow-man." (p. 85.)

Nothing in the record indicated that the defendant at any time retreated from the conflict or uttered any expression of a desire for peace. He appears to have had the advantage of his opponents throughout the fight, and the testimony is that he had the deceased

down a number of times, while his assailants appear to have been unable to put him down.. The knife which he used was drawn early in the fight, and it appears that he cut Harry in three places, and that Archie was stabbed in the abdomen, again near the spine in the small of the back, and also in his back under the shoulder blade. The defendant says he used the knife deliberately and did the cutting on purpose, "let the consequences be what they would." This statement taken in connection with other facts brought out in the case strongly tended to support a charge of an offense of a higher degree than the one of which he was convicted. It is suggested that the stabbing may not have caused Archie's death, and that it may have resulted from his transportation to the hospital and the treatment that he received there. The testimony of the physicians and surgeons in charge of Archie abundantly supports the contention that the stabbing was the proximate cause of Archie's death.

The judgment of the district court is affirmed.