No. 19,287.

THE STATE OF KANSAS, *Appellee*, v. JAY KILLION, *Appellant*.

SYLLABUS BY THE COURT.

1. MURDER — *Preliminary Examination — Complaint — Warrant.* The validity of a preliminary examination and whether the defendant has been sufficiently advised as to the charge upon which he is to be tried depends upon the complaint, the warrant and the evidence developed at the preliminary examination and not alone upon the statements contained in the warrant.

2. SAME—*Trial—Cross-examination of Defendant—Past Conduct.* For the purpose of impairing his credibility a defendant charged with murder who offers himself as a witness in the case may be interrogated on cross-examination the same as any other witness as to his past conduct and character, and as to offenses committed or altercations had as well as to having used dangerous weapons at other times.

3. SAME—*Evidence as to General Reputation.* Witnesses who have testified favorably to the general reputation of the defendant as to peace and good conduct may be asked on cross-examination if they had not heard reports of particular acts inconsistent with the good reputation to which they have testified.

4. SAME—*Instruction—Deadly Weapon—Inference of Malice.* An instruction to the effect that malice may be inferred from the fact of killing with a deadly weapon examined, and it is held that the court did not thereby take from the jury the question of whether a certain metal instrument was a deadly weapon, and, further, that the instrument was so clearly a deadly weapon that if the instruction could be regarded as an assumption of that fact no prejudice could have resulted from it.

5. SAME—*Instructions as to Different Degrees of the Offense—Not Error.* The court in charging the jury defined the different degrees of the offense charged and stated what was necessary to be proven to convict defendant on each of the different degrees. Afterwards in stating the sequence of the degrees, and that if the jury found defendant was not guilty of the higher degree it would be their duty to consider whether or not he was guilty of the next lower degree, and after telling the jury that if the evidence established, beyond a reasonable doubt, that defendant was guilty of murder in the first degree, as had been defined, they might return a verdict of guilty of murder in the first degree, the court added:

"But on the other hand if his guilt is not so established to your satisfaction beyond a reasonable doubt, then you may proceed to inquire whether he is guilty of murder in the second degree, as heretofore defined, committed in manner and form charged in the information upon the person of Milton Hillier, and at the time and place therein named, then you should return a verdict of guilty of murder in the second degree. But if you are not so satisfied beyond a reasonable doubt, then you may proceed to find whether he is guilty of manslaughter in the first degree."

The court omitted to say in this part of the instruction that defendant's guilt of this degree must be shown by the evidence beyond a reasonable doubt. The defendant was convicted of murder in the second degree. In other instructions the court, in effect, told the jury repeatedly that before they could convict the defendant of any offense his guilt must be established by the evidence to their satisfaction beyond a reasonable doubt. *Held,* that the omission in the challenged instruction could not have misled the jury and does not require a new trial.

The State v. Killion.

6. SAME—*Instructions Are to be Taken as a Whole.* The charge given to the jury is to be read and considered in its entirety, and an inaccurate expression should not be 'regarded as a ground for reversal where it appears from the whole of the instructions that the jury could not have been misled by the inaccuracy.

7. SAME—*"Reasonable Doubt."* An instruction defining and explaining the term "reasonable doubt," challenged because of brevity and incompleteness, is held not to be a ground for reversal.

8. SAME—*Instructions—Credibility of Defendant as a Witness.* The defendant has no reason to complain of an instruction to the effect that the defendant, who had testified in his own behalf, was a competent witness, and that the fact that he was charged with a crime in no way affected his credibility, but that the jury had a right to take into consideration his interest in the case.

9. SAME.    Other instructions examined and held not to be erroneous.

10. SAME—*Remarks of Prosecuting Attorney to Jury—Not Prejudicially Erroneous.* Certain language used by one of the prosecuting attorneys in which he expressed his personal opinion as to the guilt of the defendant is not deemed to be such as to require the setting aside of the verdict, and neither does the fact that there was applause by bystanders, which was promptly suppressed and rebuked by the court, afford ground for a new trial where it does not appear that the jury were affected or influenced by the incident.

11. SAME—*Evidence Upholds Verdict of Conviction.* The evidence examined and held to be sufficient to uphold the verdict of the jury.

Appeal from Finney district court; GEORGE J. DOWNER, judge. Opinion filed May 8, 1915. Affirmed.

*William H. Thompson, R. W. Hoskinson, Albert Hoskinson,* all of Garden City, and *F. Dumont Smith,* of Hutchinson, for the appellant.

*S. M. Brewster,* attorney-general, *Fred J. Evans,* county attorney, and *C. B. Griffith,* of Fort Scott, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: In this proceeding Jay Killion was charged with having, on August 25, 1913, killed and murdered Milton Hillier, a young farmer about twenty-seven years of age residing near Eminence in Finney county. Defendant's plea in abatement and motion to quash were overruled, and he was tried and convicted of murder in the second degree. His motions in arrest of judgment and for a new trial were denied, and from the judgment and sentence rendered he appeals.

It appears that Killion and Hillier were neighbors. On August 25, 1913, Hillier and his wife prepared to go to Eminence to do some trading. Hillier hitched a team to the buggy while Mrs. Hillier dressed herself and their baby, and leaving the team standing near the house, Hillier took up the baby and said he would go on ahead and open a gate that led into the road to Eminence. Mrs. Hillier, it appears, stopped at the henhouse to feed the chickens. About two hundred and forty-three feet from the henhouse and ninety-three feet north of the gate opening into the road was another gate opening into a pasture then used by defendant, and when Mrs. Hillier was about half way between the henhouse and the Eminence road gate she noticed defendant and her husband standing, the latter with his child upon his shoulder, near the pasture gate. Her version of the unfortunate occurrence is that defendant dismounted from his horse, took from his hip pocket a pair of wire pliers, and advanced towards her husband in a menacing manner. She heard the defendant cursing her husband, and she called out requesting that they do not fight, and she also heard Hillier say to defendant, "If you want to fight, lay down those pinchers and fight like a man," repeating substantially the same request three times, according to Mrs. Hillier. After making this request Hillier placed the child upon the ground, and when he was raising up defendant struck

him upon the head with the pliers, and as Hillier put
out his hands to protect himself or to catch defendant
the latter struck two more blows.   Hillier sank to the
ground, and when Mrs. Hillier ran up he told her to
" 'Phone for the folks and the doctor.' "  Mrs. Hillier
then asked the defendant to help take Hillier to the
house, and she says he responded, "Let the damn brute
lay there," and then defendant mounted his horse and
rode away.   Hillier was assisted into the buggy by his
wife.   While being driven towards the house he be-
came unconscious, and died the same afternoon without
regaining consciousness.   Defendant's story was, sub-
stantially, that when he rode up to the pasture gate in
answer to Hillier's motion for him to do so he said,.
"Good morning, Milt," and Hillier then complained to
him of the condition of the pasture gate, and after he
had dismounted from his horse Hillier cursed him and
dared him to come through the fence and take a beat-
ing.   Upon his refusal and statement that he did not
want any trouble Hillier put the baby down and went
through the fence and attacked him, having at the
time something in his hand which defendant thought
was a knife.   Defendant retreated and Hillier continued
to follow him, striking a blow which defendant warded
off with his elbow, and then defendant struck Hillier
once only with the pliers, and he says he does not know
as a certainty whether or not he hit Hillier.   Defendant
claimed also that he was in fear of great bodily harm
when he struck Hillier, and when he did strike did not
do so with his full force but only "hard enough so I
thought I could repel the attack.". On the trial of the
case it was admitted that a blow on the head caused
the death of Hillier.   Evidence was introduced tending
to show defendant's good character, and it was claimed,
too, that he acted in self-defense only.

On this appeal complaint is made of a number of
rulings, including the overruling of a plea in abate-
ment, the admission of certain evidence, the giving of

instructions, and the refusal of some that were requested, and the conduct of an assistant prosecuting attorney while addressing the jury.

The first contention is that defendant did not have a proper preliminary examination on the charge of which he was convicted. In the original complaint it was alleged that the defendant did, at a certain time and place, "unlawfully, feloniously, and with malice aforethought strike and beat with a deadly weapon, to wit, a pair of pinchers, one Milton Hillier, and that his assault was so deadly that he, Hillier, died from the effect of same by 4 o'clock of said 25th day of August, 1913." This charge was repeated in the warrant under which the defendant was arrested. Subsequently, and prior to the preliminary examination, an amended complaint was filed which fully and definitely set forth a charge of murder. Upon this complaint the preliminary examination was had. The sufficiency of the warrant, or the charge alleged in it, was not raised prior to the preliminary examination. If an offense was not sufficiently alleged in the warrant the defendant might have raised the question before the examination was had, but when he submitted to an examination without challenging the sufficiency of the warrant he was not entitled to have the prosecution abated merely because of the incompleteness of the charge in the warrant. The validity of the preliminary examination did not depend alone on the averments in the warrant. As raised here the legality of the preliminary examination rests on the complaint, the warrant and the testimony produced at the preliminary examination. It is essential that the defendant shall have notice of the nature and character of the offense charged against him, but under the law he must take notice not only of the charges in the complaint and warrant but also of those developed in the evidence offered at the preliminary examination. (*The State v. Bailey*, 32 Kan. 83, 3 Pac. 769; *The State v. Tennison*, 39 Kan. 726, 18

Pac. 948; *The State v. Fields,* 70 Kan. 391, 78 Pac.
833.)   The charge in the original complaint, although
incomplete and indefinite, notified the defendant that
he was charged with striking Hillier with a deadly
weapon unlawfully, feloniously and with malice afore-
thought, and thereby causing his death.   To feloniously
strike means that it was done with a malignant pur-
pose, and the charge that he struck Hillier with a
·deadly weapon with malice aforethought informed de-
fendant that he was required to meet an accusation that
he struck Hillier with a weapon calculated to kill, with
a felonious purpose and with a wicked intention pre-
viously and deliberately formed.   (*The State v. Mc-
Gaffin,* 36 Kan. 315, 13 Pac. 560.)   Assuming, how-
·ever, that the charge was insufficient of itself, it, with
the amended complaint which lacked nothing in full-
ness and precision, taken in connection with the testi-
mony that was offered at the hearing, must have left
the defendant without doubt that the charge which he
must meet was included in the one of which he was
convicted.

There is complaint that on cross-examination the
defendant was asked if he had not had fights at three
times prior to this homicide. . The questions were
asked and answered without objection from the de-
fendant.   Later, when the defendant was recalled, the
prosecution inquired as to a particular fight which
had been previously referred to, and to this an ob-
jection was made which was overruled.   When the
defendant became a witness in his own behalf he
opened the way for the state to test his veracity on
cross-examination.   It has been held that for the pur-
pose of impairing his credibility a defendant who
takes the witness stand may be interrogated to the
same extent as any other witness in regard to his past
conduct and character, to any altercations or offenses,
and to his having used dangerous weapons at other
times.   (*The State v. Pfefferle,* 36 Kan. 90, 12 Pac.

406; *The State v. Wells,* 54 Kan. 161, 37 Pac. 1005; *The State v. Buffington,* 71 Kan. 804, 81 Pac. 465, 4 L. R. A., n. s., 154; *The State v. Pugh,* 75 Kan. 792, 90 Pac. 242.) Such testimony can only be used to affect his credibility, and how far the inquiry may go is largely a matter of discretion with the trial court. The court should not permit it to be unreasonably extended, and certainly that was not done in this case.

There is a complaint that witness Reeve was not permitted to testify that he had not heard the character of the defendant for peace and orderly conduct called in question. The exclusion appears to have been based on the fact that the witness was not well acquainted with the reputation of the defendant in the community where he resided. Subsequently, however, he was permitted to state that he had never heard of the defendant being charged with any offense or involved in any trouble or difficulty. The testimony of another witness, who had limited knowledge as to defendant's reputation, was excluded, but much evidence of this character was received in behalf of the defendant where the witnesses were qualified to testify.

Some complaint is made that witnesses who had testified as to the general reputation of the defendant, and that it was good, were allowed to be cross-examined as to whether or not they had heard that defendant had committed or been accused of particular acts of misconduct and of being in fights at certain times. Where witnesses have testified to the good character of the defendant it is permissible to inquire of them whether they have not heard reports of particular instances which are inconsistent with the good reputation to which they have testified, and in that way seek to weaken or qualify the testimony which they have given. (*The State v. McDonald,* 57 Kan. 537, 46 Pac. 966; *The State v. Yeater,* ante, p. 247, 147 Pac. 1114; 12 Cyc. 416.)

It is urged that the court in instructing the jury trenched upon the province of the jury by assuming

that the instrument with which the defendant killed Hillier was a deadly weapon. In an instruction the court defined a number of the terms used in describing the offense charged, and among others "malice" and "malice aforethought." In one part of the instruction the court said:

"Malice, however, may be inferred from the fact of killing with a deadly weapon, and the use of a deadly weapon, with which to do the killing should be considered by you together with all the other evidence in the case for the purpose of determining whether the act was malicious or not."

It is insisted that the court assumed and decided that the pliers used by the defendant in the homicide, and which was a heavy metal tool, was a deadly weapon. It appears, however, that the court was not undertaking to characterize the tool, but was defining malice, and, speaking generally, said that if the killing of a person was done with a deadly weapon the jury might infer malice, and that such an inference, if it were drawn, taken in connection with other evidence, might be used in determining whether the act was malicious or not. This is shown more clearly by the following sentence of the instruction where the court said:

"A deadly weapon is an instrument which if used in a dangerous manner, is likely to cause death or great bodily harm."

The defining of a deadly weapon indicates that the court was leaving to the jury the question whether the instrument used in the manner it was used constituted a deadly weapon. No error could have resulted if it had been assumed that the pliers, as used by the defendant, was a deadly weapon. As described it was as deadly as a hammer or other heavy metal tool. The instrument was before the jury, and when used in a dangerous manner, as it is admitted to have been used, there could be no question of its deadly character. However, the character of the instrument and the use

made of it was left, as we have seen, to the determination of the jury, and they were told that from this testimony, in connection with other testimony in the case, the guilt or innocence of the defendant was to be determined.

It appears from the charge of the court that "malice," "deadly weapon" and "reasonable doubt" were sufficiently defined, and also that the rule of self-defense was sufficiently and properly stated, and hence there was no error in refusing the defendant's requests on those subjects.

It is argued that the giving of the second clause of the twentieth instruction was fatal error. The instruction covered all the degrees of the offense from murder to manslaughter in the fourth degree, sequentially stated. The first part of the instruction is as follows:

"If you find from the evidence beyond a reasonable doubt that the defendant is guilty of murder in the first degree, as heretofore defined, committed in manner and form as charged in the information, on the person of Milton Hillier, and at the time and place therein named, then you should return a verdict of guilty of murder in the first degree. But on the other hand if his guilt is not so established to your satisfaction beyond a reasonable doubt, then you may proceed to inquire whether he is guilty of murder in the second degree, as heretofore defined, committed in manner and form charged in the information upon the person of Milton Hillier, and at the time and place therein named, then you should return a verdict of guilty of murder in the second degree. But if you are not so satisfied beyond a reasonable doubt, then you may proceed to find whether he is guilty of manslaughter in the first degree."

There is a manifest defect in that part of the instruction which relates to the charge of murder in the second degree, and if the charge did not otherwise define the offense and state the ingredients essential to be established the instruction might be regarded as misleading. It is said that a clause was inadvertently dropped out by a stenographer in copying the instruc-

tion from manuscript previously furnished to him, and that the omission was not observed until after the trial. It is said that as drawn it read:

"But on the other hand if his guilt is not so established to your satisfaction beyond a reasonable doubt, then you may proceed to inquire whether he is guilty of murder in the second degree, *and if you find from the evidence beyond a reasonable doubt that the defendant is guilty of murder in the second degree,* as heretofore defined, committed in manner and form charged in the information upon the person of Milton Hillier, and at the time and place therein named, then you should return a verdict of guilty of murder in the second degree."

The italicized clause was omitted. Other instructions stated, in effect, that the defendant could not be found guilty of any degree of the offense unless it was proven by the evidence beyond a reasonable doubt. In the seventh instruction the court advised the jury of the elements which enter into murder in the second degree, and after enumerating the essential ingredients the court said:

"If any one of those essentials, viz: malice, intent, willfulness, design, mode of killing or place of killing, is not proven to your satisfaction beyond a reasonable doubt, you should acquit the defendant of the charge of murder in the second degree."

In the third instruction, after stating the degrees of the offense alleged in the information, including murder in the second degree, the jury were told:

"If you believe from the evidence beyond a reasonable doubt, that the defendant is guilty of some degree of the offense charged, and there be in your minds a reasonable doubt as to which of the several degrees of the offense charged he is guilty, your verdict must be for the lowest of said degrees."

Over and over again the jury were reminded, in effect, that it was incumbent on the state to prove every ingredient of the offense charged, including the lesser degrees of it, by competent evidence, that guilt must be

established by proof beyond a reasonable doubt, and if the evidence left any reasonable doubt in the minds of the jury of the defendant's guilt they should acquit him. It is reasonably clear that the acknowledged omission in the instruction could not have led the jury to the idea that their verdict was not to be based upon the evidence. No one with ordinary intelligence could have thought, after listening to the entire charge, that the defendant might be found guilty of murder in the second degree regardless of the evidence. As we have seen, the court was only stating the sequence of the degrees of the offense in instruction twenty, and had, in other instructions, stated to the jury, with particularity, what was necessary to a conviction in any one of the degrees. The clause immediately following the reference to murder in the second degree in the twentieth instruction shows that the offense was to be established by the evidence beyond a reasonable doubt, as it recites:

"If you are not so satisfied beyond a reasonable doubt, then you may proceed to find whether he is guilty of manslaughter in the first degree."

It has been held that the charge of the jury is to be read in its entirety and that an inapt word or an inaccurate expression will not be regarded as ground for reversal where it appears from the whole charge that the jury could not have been misled by the inaccuracy. (*The State v. Atterberry,* 59 Kan. 237, 52 Pac. 451.)

It is said that the instruction as to reasonable doubt was abbreviated and incomplete. It read:

"The term 'Reasonable Doubt' best defines itself. In a legal sense, however, a reasonable doubt is a doubt which has some reason for its basis. It does not mean a doubt from mere caprice or groundless conjecture. A reasonable doubt is such a doubt for which the jury is able to give a reason."

The court was right in stating that the term best defines itself. It is very doubtful whether the term can

be helped or made clearer by definition. In *The State v. Davis,* 48 Kan. 1, 28 Pac. 1092, it was said:

"The idea intended to be expressed by these words can scarcely be expressed so truly or so clearly by any other words in the English language. And generally the attempted definitions of them by courts or others are simply misleading and confusing, and not proper explanations of their meaning at all." (p. 11.)

Brevity, of itself, can hardly be regarded as a defect, and definitions substantially similar to the one given have been approved. (*The State v. Patton,* 66 Kan. 486, 71 Pac. 840; *The State v. Wolfley,* 75 Kan. 406, 89 Pac. 1046.)

The instruction relating to the testimony offered of the reputation and good character of the defendant is not open to the criticisms which have been made, and we find no error in the one referring to the fact that the defendant testified in his own behalf. In it the court told the jury that the defendant was a competent witness and the fact that he was charged with a crime did not affect his credibility as a witness, and that his evidence should be considered with all the other evidence and circumstances of the case. Then there was added the clause to which objection is particularly made—that the jury might take into consideration his interest in the case. The instruction, on the whole, was intended to benefit the defendant, and the last clause was only stating a common rule that the jury have a right, in weighing evidence, to consider the interest of any witness in the case.

An examination of all the criticisms of the instructions has been made, and we find nothing in them that would justify reversal.

It is urged that there was misconduct of counsel for the state and that applause by the audience of improper remarks by counsel was permitted by the court to the prejudice of the defendant. In his address to the jury assistant counsel for the state said, in sub-

stance, that the jury must find either that Gertie Hillier (wife of the deceased) was a liar and a perjurer or that the defendant was a liar and a perjurer, and that if they found one way they would drive Gertie Hillier out of the court room disgraced and branded as a liar and a perjurer, and counsel added his own opinion that the defendant was a murderer and a perjurer. During the closing argument the court room appears to have been crowded, and affidavits were made to the effect that persons in the court room applauded remarks made by counsel for the state at different times. Other witnesses say that there was only slight applause twice during the argument, that it was not general, and that it was promptly suppressed by the court. The clerk of the court, who was watching the proceedings, stated that the attempt at applause was not participated in by any considerable number of the audience but was scattered and spasmodic, and was checked by the court before it proceeded to the extent of attracting particular attention, and, further, that he observed no manifestation or evidence of hostility toward the defendant. While some strong language was used by counsel and while he went beyond the line of propriety by including his personal opinion as to the guilt of defendant, there appears to have been no objection to his remarks, and, besides, they are not such as to have led the jury to depart from the instructions or to require the granting of a new trial. The applause of the audience appears to have been promptly checked and rebuked by the court. An outbreak of applause by bystanders during an argument, which is promptly suppressed and condemned, is not a ground for a new trial unless it is shown that the jury were influenced by the incident. (*The State v. Warner,* 93 Kan. 378, 144 Pac. 220.) In passing on the motion the court has found that the demonstration was not of such a character as to have influenced the jury or affected the verdict.

It is earnestly argued that the testimony, in any event, did not warrant a conviction of a higher degree than manslaughter.  There was testimony from which the jury might have inferred that the offense did not rise above the grade of manslaughter.  But if the testimony of Mrs. Hillier, the wife of the deceased, is accepted, as it evidently was, it is undoubtedly sufficient to uphold the verdict.  Her evidence warranted the inference that the defendant's attack on Hillier was willfully and maliciously made with intent to take his life.  The same testimony warranted the inference, too, that the defendant was the aggressor, that he had no reasonable grounds to believe that he was in danger of receiving great bodily harm at the hands of Hillier, and that the homicide was without justification or excuse.  His testimony, it is true, contradicted that of Mrs. Hillier in most of the essential features, but there are some circumstances in the case which appear to confirm her testimony.  After hearing the two witnesses the jury concluded that the testimony given by Mrs. Hillier was truthful, and this court can not say that it is unworthy of belief nor that the jury reached a wrong conclusion.

The judgment is affirmed.