No. 31,073.

The State of Kansas, *Appellee,* v. R. C. Mathews, *Appellant.*

(21 P. 2d 408.)

Opinion filed May 6, 1933.

*H. S. Hines,* of Arkansas City, for the appellant.

*Roland Boynton,* attorney-general, *E. E. Steerman,* assistant attorney-general, *L. C. Brown,* county attorney, *Geo. W. Stanley,* deputy county attorney, and *E. T. Bloomer,* special county attorney, for the appellee; *E. M. Knight, W. L. Cunningham, D. Arthur Walker, Fred G. Leach* and *Wm. E. Cunningham,* all of Arkansas City, of counsel.

The opinion of the court was delivered by

JOHNSTON, C. J.: R. C. Mathews was charged with the murder of J. E. Warren, and the trial resulted in a conviction for murder in the first degree. The defendant appeals.

J. E. Warren owned a ranch in the south part of Cowley county, and the defendant, Mathews, had been a tenant on Warren's farm. The tenancy terminated on March 1, 1932, and Mathews was engaged in moving from Warren's ranch at the time of the tragedy. On March 2, 1932, Warren and his son were making a daily tour of the ranch, to feed and care for 310 head of cattle. In a cornstalk field owned by Warren, in which Mathews had turned his own live stock, the Warrens found the cattle trespassing and proceeded to drive them out on the road and to impound them as trespassing cattle. As they were driving the cattle on a road which runs across Warren's ranch towards his home place, one of the Mathews family saw Warren and his son taking up and driving away the cattle and rode a horse about a mile south to tell Mathews of the occurrence. Mathews immediately mounted his horse, rode back to his house and procured his son to bring him a twelve-gauge Winchester pump gun, and went up the road in pursuit of the Warrens, who did not know of his approach until he was within 25 or 30 feet of them and directly behind them, when, according to the testimony of the state, Mathews shouted, "Get to shootin', Big Boy," and instantly shot Warren in the back. Warren only lived about an hour after he was shot. Two more shots were fired by the defendant, and then Warren's son, who was along and had a pistol with him, in defense of his father fired shots, one of which struck Mathews in the neck, making a slight wound. The defendant went to Newkirk, Okla., at once, where the Kansas officers found and arrested him. A preliminary examination was held, and the magistrate found that a crime had been committed and that there were good grounds for holding the defendant guilty of its commission.

The first complaint raised on this appeal is that the magistrate was not warranted in finding that a crime had been committed and that there was probable cause to believe that the defendant had committed it. The complaint upon which the warrant was issued is included in the record and is a sufficient charge of the murder of Warren by the defendant, and it is conceded that the warrant contained a charge in the terms of the complaint.

Several witnesses were examined, among them a doctor called after the encounter, who took Warren to the hospital. On examination he found a ragged hole of three or four inches in Warren's back, which went straight through the body, entering one or two inches to the right of the spine. The hole was big enough to stick three fingers into it. Warren was still conscious and inquired of the doctor if he could get well, and the doctor answered, "Jim, I think you are a dead man." The doctor asked Warren who shot him and the reply was: "It must have been Shorty Mathews;" and when asked, "How did he shoot you in the back," replied: "I don't know, I never saw him." Shortly afterwards Warren became unconscious and died about an hour later. Witnesses who described Mathews' shotgun, which was found there, testified the cartridges carried No. 4 shot and that the gun was near the body of Warren, where much blood was found.

There was testimony offered to show that the shooting occurred in Kansas near the Oklahoma state line, and it is now conceded that it occurred in Kansas. The testimony also showed that after the shooting defendant went to Oklahoma and was there found and arrested.

Although the facts were not fully brought out in the examination, we think it is sufficient to accomplish the purpose of a preliminary examination. That purpose is to give the accused notice of the nature and character of the offense charged against him. It has been decided that:

"It is essential that the defendant shall have notice of the nature and character of the offense charged against him, but under the law he must take notice not only of the charges in the complaint and warrant but also of those developed in the evidence offered at the preliminary examination." (*State v. Killion,* 95 Kan. 371, 376, 148 Pac. 643.)

Under the law stated, the charge made and the evidence taken fully advised the defendant of the charge which he was required to meet in the final trial of the case. See, also, *State v. Bailey,* 32 Kan. 83, 3 Pac. 769; *State v. Tennison,* 39 Kan. 726, 18 Pac. 948.

On the trial, which resulted in a verdict of guilty of murder in the first degree, the principal complaint of defendant is that the evidence is not sufficient to sustain the finding. He insists that Warren was the aggressive party in the encounter and was, in fact, engaged in stealing the defendant's live stock when the shooting occurred; further, that Warren and his son were each armed with guns, and

that while he called at his home and got the shotgun to pursue the Warrens, it was not done with the purpose of shooting them, but as a cautionary measure that if Warren should attack him he might be able to defend himself. The only witnesses to the shooting of Warren were Joe Warren, the son of deceased, who was about nineteen years of age, and the defendant. Joe Warren testified about the assault and the shooting, and after stating that he and his father were making the rounds of the ranch to feed and take care of 310 cattle, and in going the rounds they came to a stalk field near the house where Mathews had been living and discovered cattle and horses in the field. They did not see Mathews and had the impression that he had moved away from the ranch, and they were taking up and driving the live stock from the field. He said:

"As we drove them up through the timber along that road we didn't see Shorty Mathews coming after us at any time. The first indication we had that Shorty Mathews was near was two things right together. I saw a movement out of the corner of my eye and heard a shout. I heard him say, 'Get to shootin', Big Boy.' Right then a shotgun shot. I could see it in his (Shorty Mathews') hand. Shorty Mathews at that time was just a little behind me. I didn't know how far—not very far—about three, four or five steps. Maybe a little farther than 15 or 20 feet. My father was just a step or so ahead of me. As the road comes up there it splits. It was just in front of that little island in the middle of the road there where we were that he said. 'Got to shootin', Big Boy.' The road there goes around on each side of that little island, I call it. We were just north of that. Just passed it. As we went around where the road splits I was on the left side or west side. Father was on the right-hand or east side. When I heard this shout, I looked around, I saw Shorty Mathews, with a gun raised up. He was holding like this (indicating). He was aiming at my dad. Up to that time I hadn't known that Shorty Mathews was anywhere near there. I hadn't heard any sound from him until he said, 'Get to shootin', Big Boy.' The shot struck my father in the back. He (Shorty Mathews) was pointing the gun at my dad. After the shot I turned my head and my father had a hole in his coat—the same coat that was introduced in evidence. As soon as Shorty Mathews shot, father started to turning. He just stuck his gun back like this (indicating), and pulled the trigger; he about half way turned his head far enough to see out of the corner of his eye. I didn't hear father say anything. The next thing Shorty Mathews did was he worked his gun for another shot. I turned my head just then. I heard this second or third shot, whichever it was. That didn't hit father. Shorty at that time was coming right on after father. He was holding his gun up to his shoulder. My father's gun was right in front of him and I couldn't see it. He didn't have it in a position to shoot. Father was sitting right straight in the saddle looking forward. Shorty came up closer to dad. He was aiming his gun towards dad. I heard the shot. It was a

shotgun shot. At that time I got my pistol, cocked it, and shot at Shorty. I shot in his general direction. He was close to me. I knew he was shooting at my father. I wanted to save my father. . . .

"After I shot Shorty, father went right on down the road ahead of me. At first he sat up in the saddle like he wasn't hurt much, but he kept slumping lower every time the horse would hit. Finally he fell off on his face. I got off to see how bad he was hurt. He was unconscious. I tried to talk to him. His gun was lying where he dropped it when he fell off, right near where he fell. . . .

"Mathews was still on his horse when he shot. After he fired the first shot he still kept right on after father on the horse. Father's horse was going right on north away from Mathews. . . .

"There wasn't any time from the time I first knew Mathews was there that my father turned around and advanced towards Mathews. He was headed away from Mathews all the time."

The testimony of the defendant was to the effect that when informed that his cattle were being driven away he went to the house and procured the gun and followed the Warrens up the road over which the cattle were driven. He denied that he made the expression, "Get to shootin', Big Boy," and did say, "Jim, wait a minute." When Warren turned and fired a shot at him he was then about fifty feet away and that his horse began plunging and that he did not fire a shot at Warren until after he had been shot at, and further that the first shot was accidental, as he pulled the trigger when he was trying to hold the horse, and that he believed that his third shot was the one that struck Warren, and that was almost at the same time that Joe was shooting at him. He testified further that when Jim Warren fired he was shooting with his left hand. On that phase of the case it may be said that a number of witnesses testified that Warren was right-handed and always shot right-handed.

It is clear that although somewhat in conflict, the testimony abundantly supports the theory of the state and the verdict of the jury. It shows that he was pursuing Warren armed with a shotgun and began shooting while they were moving north and away from him and were unconscious of his presence there until the fatal shot was fired. The fact that Jim Warren was shot in the back is persuasive evidence that Warren was not advancing on the defendant at the time. The horse upon which Warren was riding was still going north away from the defendant and continued to do so until Warren fell from his horse in a helpless and dying condition. The evidence of Joe Warren, the son, confirmed as it is by a number of circum-

stances, is wholly inconsistent with the theory that the defendant had to shoot Warren to save his own life.

In the course of defendant's testimony, he said:

"I admitted a while ago that I shot Jim Warren in the back. At the time I shot him in his back his horse was facing north. I was behind him. Immediately before I started shooting, . . . his horse was practically headed north, most of the time. I never said his horse was ever facing south."

Defendant calls attention to the fact that the Warrens, themselves, were armed with guns on the trip they made that morning. There was testimony that it was the general practice of cattlemen, when out to run or handle cattle, to carry guns, and one witness said that Warren frequently carried a gun when he was out handling cattle. Further, he stated that there were rabbits and coyotes in that region and that occasionally Warren killed rabbits and coyotes. The latter, he said, destroyed chickens on the place. It may be noted, too, that the Warrens did not expect to meet or see Mathews on the tour, nor did they anticipate trouble with him. Certainly there was sufficient evidence to support the charge of murder. Defendant's own admissions go far to uphold the verdict.

Complaint is made of the instructions given the jury. The court informed the jury that defendant was charged with having willfully, deliberately, premeditatedly and with malice aforethought, killed and murdered Warren by shooting him with a shotgun; that defendant had entered a plea of not guilty and is presumed to be innocent until proven guilty beyond a reasonable doubt. The court then defined the degrees of murder as follows:

"The defendant is charged with the murder of Jim Warren. Murder at common law is where a person of sound memory and discretion unlawfully kills any reasonable creature in being in the peace of the state, with malice aforethought, either expressed or implied.

"Our statute divides murder in two degrees, murder in the first degree and murder in the second degree.

"Murder in the first degree under our statute is where there is an unlawful killing as above defined, and wherein there are the elements of deliberation and premeditation. That is, in order to constitute murder in the first degree under our statute there must be, in addition to a malicious killing, prior deliberation and premeditation; that is, the mode or plan to be carried out must have been prior to the actual killing and have been deliberated upon or thought out. However, this plan or means of taking life does not precede the killing any considerable length of time, so that the mode decided upon, however short the time, would be sufficient if the mind of the slayer actually determined upon the manner in which he should commit the offense.

"Murder in the second degree is the unlawful killing of another by a person with malice, but not necessarily should there be any deliberation or premeditation as to the mode or manner of killing. That is, to constitute the charge of murder in the second degree the chances of how the killing should be done do not have to be weighed, considered or estimated, nor the means planned, contrived or schemed beforehand, as is necessary in first-degree murder."

It will be observed that the instruction omits the word "willful," a term used in the statute which defines the offense of murder. The word as used in the charge of murder means intentionally or designedly done, and not accidentally. (*State v. Avery,* 111 Kan. 588, 591, 207 Pac. 838; *Gatewood v. Commonwealth,* 215 Ky. 360; 4 Words and Phrases, 2d Ser., p. 1295.)

In instruction number six the court added:

"If you determine that the killing was malicious, unlawful, deliberately and premeditatedly done, you should so find in your verdict."

That was the finding of the jury. The language employed by the court in its instruction fairly includes and covers a willful or intentional act. The court charged that it must have been done unlawfully and maliciously with deliberation and premeditation, he having thought out in advance a mode of killing, a plan which he carried out, having deliberately thought out the plan or means of killing. Doubtless the court would have added the word inadvertently omitted, if its attention had been called to it, but we think that the terms used clearly import a willful act, and that no prejudice resulted to defendant from the omission of the word in the instruction.

The evidence fully supports the theory that the killing was willfully and feloniously done with malice and with deliberation and premeditation. The charge as to murder in the second degree, wherein the elements of deliberation and premeditation were eliminated, is without material error.

There is some criticism of a remark of the court that evidence of the admission made by defendant, did not leave room for the claim that he acted in lawful defense of his own person, but the court gave a charge in respect to the law of self-defense. In view of the defendant's admissions there was no material error in the remark.

Some objections are made to rulings on the admission of evidence, but it is plain that they cannot be regarded as grounds of error nor do they require special consideration or comment.

Our conclusion is that the judgment must be affirmed. It is so ordered.