No. 31,284

THE STATE OF KANSAS, *Appellant*, v. FRANK E. BLASER and CLARENCE E. VOLLMER, *Appellees*.

(26 P. 2d 593.)

Opinion filed November 11, 1933.

*Roland Boynton,* attorney-general, *Walter T. Griffin* and *Dunkin Kimball,* assistant attorneys-general, and *John W. Wood,* county attorney, for the appellant.

*W. A. Ayres, Austin M. Cowan, C. A. McCorkle, J. D. Fair, W. A. Kahrs* and *R. H. Nelson,* all of Wichita, for the appellees.

The opinion of the court was delivered by

HARVEY, J.: This is an appeal by the state from the judgment of the trial court sustaining a motion to quash an information which attempted to charge defendants with the violation of R. S. 1931 Supp. 44-201, in that while constructing a school building in the city of Wichita, under a contract with the board of education of that city, defendants did "employ laborers and other persons at a less wage than the current rate of per diem wages in the locality said work and labor was performed." The statute above referred to, among other things, provides: "Not less than the current rate of per diem wages in the locality where the work is performed shall be paid to laborers or other persons so employed" on contracts with the state, or its municipalities, for construction work. The statute contains a definition for the word "locality," and for the phrase "the current rate of per diem wages," and the state contends that R. S. 44-205 provides the penalty sought to be imposed.

The motion to quash, broadly speaking, was predicated upon two grounds: *First,* that the statute is so indefinite as to be unconstitutional; and, *second,* that the information does not state facts sufficiently definite and certain to form the basis of a prosecution or to enable defendants to know with what specific thing they are charged as constituting an offense.

As to the first ground, a statute of the state of Oklahoma, identical with our R. S. 44-201 (prior to its amendment by chapter 214, Laws 1931), was held void by the supreme court of the United States in *Connally v. General Const. Co.,* 269 U. S. 385. The headnotes read:

"1. A criminal statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must guess at its meaning and differ as to its application, lacks the first essential of due process of law.

"2. Oklahoma Comp. Stats. 1921, §§ 7255, 7257, imposing severe, cumulative punishments upon contractors with the state who pay their workmen less than the 'current rate of per diem wages in the locality where the work is performed,'—*held* void for uncertainty."

In the opinion it was said:

"That the terms of a penal statute creating a new offense must be suf-

ficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized· requirement, consonant alike with ordinary notions of fair play and the settled rules of law." (p. 391.)

citing *International Harvester Co. v. Kentucky*, 234 U. S. 216, 221; *Collins v. Kentucky*, 234 U. S. 634, 638. Also, *United States v. Cohen Grocery Co.*, 255 U. S. 81, 92, where a section of the food-control act of 1917, which imposed a penalty upon any person who should make "any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries," was held to be invalid in that the words fixed no ascertainable standard of guilt and forbade no specific or definite act. Also, *United States v. Capital Traction Co.*, 34 App. D. C. 592, where a statute which made it an offense· for the street-car company to run an insufficient number of cars to accommodate passengers "without crowding," was held void for uncertainty. Considering the statute under review, requiring the contractor, at the risk of incurring severe and cumulative penalties, to pay his workmen "not less than the current rate of per diem wages in the locality where the work is performed," the court said:

"We are of opinion that this provision presents a double uncertainty, fatal to its validity as a criminal statute. In the first place, the words 'current rate of wages' do not denote a specific or definite sum, but minimum, maximum and intermediate amounts, indeterminately, varying from time to time and dependent upon the class and kind of work done, the efficiency of the workmen, etc. . . . The statutory phrase reasonably cannot be confined to any of these amounts, since it imports each and all of them. The 'current rate of wages' is not simple but progressive—from so much (the minimum) to so much (the maximum), including all between; and to direct the payment of an amount which shall not be less than one of several different amounts, without saying which, is to leave the question of what is meant incapable of any definite answer. . . . the vice of the statute here lies in the impossibility of ascertaining, by any reasonable test, that the legislature meant one thing rather than another, and in the futility of an attempt to apply a requirement, which assumes the existence of a rate of wages single in amount, to a rate in fact composed of a multitude of gradations. To construe the phrase 'current rate of wages' as meaning the lowest rate or the highest rate or any intermediate rate or, if it were possible to determine the various factors to be considered, an average of all rates, would be as likely to defeat the purpose of the legislature as to promote it." (*Connally v. General Const. Co.*, 269 U. S. 385, 393, 394.)

There is a further discussion of the uncertainty of the word "locality."

Following this decision of the supreme court of the United States,

our legislature, in 1931 (Laws 1931, ch. 214), amended R. S. 44-201 so as to include definitions as follows:

" 'The current rate of per diem wages' for the intents and purposes of this act shall be the rate of wage paid in the locality as hereinafter defined to the greater number of workmen, laborers, or mechanics in the same trade, occupation, or work of a similar nature. In the event that it be determined that there is not a greater number in the same trade, occupation or on similar work paid at the same rate, then the average rate paid to such laborers, workmen or mechanics in the same trade, occupation or work, shall be the current rate. The 'locality' for the purpose of this act shall be the county wherein the physical work is being performed: *Provided*, That where cities of the first or second class are located in said counties, each such city shall be considered a locality."

Disposing first of the word "locality," as thus defined and as applied to this case, we have no difficulty in saying that since the work here was being done in the city of Wichita, a city of the first class, the city is the locality referred to in the statute, although the contract under which the work was being done was made with the board of education of the city. Looking at the definition given in the statute of the phrase, "the current rate of per diem wages," and comparing that with the reasons given by the supreme court in *Connally v. General Const. Co.*, supra, the definition seems to be open to all the objections stated against it in that opinion. It is conceded in the argument in this case that our statute (R. S. 44-201), in so far as it attempted to fix criminal liability upon contractors or others for not paying "the current rate of per diem wages," was open to the same infirmities as the Oklahoma statute, held invalid in *Connally v. General Const. Co.*, supra. But it is argued that the amendment made in 1931 defining the term, "the current rate of per diem wages," cured that defect and rendered the statute valid. We are unable to see that it has that effect. In fact, the definition does but little, if anything, more than to paraphrase the objections made to the statute by the court in *Connally v. General Const. Co.*, supra.

Perhaps our legislature was prompted to make the amendment to the statute in 1931 by reason of the opinion of the court of appeals of New York in *Campbell v. City of New York*, 244 N. Y. 317, 155 N. E. 628, 50 A. L. R. 1473. In that case the city, in making a contract for public work, had inserted in the contract the provisions of a statute similar to our R. S. 44-201 and added provisions defining the word "locality" as signifying the city of New York, and the

"prevailing rate of wage" to be the "rate paid to a majority of the laborers, workmen or mechanics engaged in the same trade or occupation in the city of New York"; and if there was not a majority paid "at the same rate, 'then the rate paid to the greater number of such trade or occupation in the city of New York.' . . . 'Provided, that such greater number constitute at least 40 per centum,' of such workmen. If less than forty per cent were paid at the same rate, then the prevailing rate was to be the 'average rate paid to such laborers.' " Workmen employed under the contract were to be included in reckoning the total number. Certain taxpayers sued to enjoin the letting of the contract, or the performance of the work under it, on the ground that the statute, in so far as it prescribes the payment of such wages, is unconstitutional, being indefinite, and that the added definitions do not correct the uncertainty; that the bidders would be unable to bid with understanding and would be driven to increase their bids as a protection against obligations unknown and unknowable, with resulting waste and injury to the city and its taxpayers. Chief Judge Cardozo, now a member of the United States Supreme Court, wrote the opinion, which turned almost entirely upon the question: Can a contract be said to be illegal when it follows the terms of the statute? In the opinion it was said:

"The form of contract being lawful to the extent that it repeats the provisions of the statute, there is no occasion to determine the remedies, criminal or civil, that will be available to the municipality if the claim shall be made hereafter that those provisions have been violated. *Questions of that order, suggested in the briefs of counsel, are mentioned only to reserve them.* (Italics ours.) We do not now determine whether *Connally v. General Construction Co.,* supra, stands in the way of criminal prosecution. Distinctions of place and circumstance may conceivably exist. . . . This 'is not the time to attempt a definition of 'the prevailing rate of wages' with its background of legislative history and twenty years or more of practical construction. One finds it hard to believe that a *cliché* so inveterate is devoid of meaning altogether. Learned judges have said (citations) that it is synonymous with market rate. This might not exclude altogether the possibility of fluctuations and diversities at a given day and place. There can be little doubt that it would furnish us with criteria of conduct adequate for civil, if not for criminal, liability. (Citations.) Other judges have believed that the range of variation is wider and less certain than any that is consistent with the standards of a market value. Even so, a customary minimum might coexist with a customary maximum, however varying the number of intermediate gradations. A standard so indefinite, if effective for nothing else, would prevent the fall of wages below the customary minimum. A level would be established below which the

rate could not descend and still be characterized as 'prevailing.' The legislature may have thought that the statutory promise would not be wholly without value if it availed for this and nothing more. There would be no merciless exploitation of the indigent or idle." (pp. 328, 329.)

In this connection it is worth while to note the decision of the Maryland court of appeals in *Ruark v. Engineers' Union*, 157 Md. 576, 146 Atl. 797, holding a statute similar to our R. S. 44-201 to be constitutional even as a basis for criminal action. The discussion of that question in the opinion is difficult to be reconciled with *Connally v. General Const. Co.*, supra.

Let us now examine more carefully our own statute and its history. It was originally passed in 1891 (Laws 1891, ch. 114). The title of the act as passed read:

"An act constituting eight hours a day's work for all laborers, workmen, mechanics and other persons employed by or on behalf of the state of Kansas, or by or on behalf of any county, city, township or other municipality in said state, or by contractors or others doing work or furnishing material for the state of Kansas, or any county, city, township, or other municipality thereof, and providing penalties for violation of the provisions of this act."

It contained five sections, the first three sections of which read:

"SECTION 1. That eight hours shall constitute a day's work for all laborers, workmen, mechanics or other persons now employed, or who may hereafter be employed by or on behalf of the state of Kansas, or by or on behalf of any county, city, township, or other municipality of said state, except in cases of extraordinary emergency which may arise in time of war or in cases where it may be necessary to work more than eight hours per calendar day for the protection of property or human life: *Provided,* That in all such cases the laborers, workmen, mechanics or other persons so employed and working to exceed eight hours per calendar day shall be paid on the basis of eight hours constituting a day's work: *Provided further,* That not less than the current rate of per diem wages in the locality where the work is performed shall be paid to. laborers, workmen, mechanics and other persons so employed by or on behalf of the state of Kansas, or any county, city, township or other municipality of said state; and laborers, workmen, mechanics and other persons employed by contractors or subconstractors in the execution of any contract or contracts within the state of Kansas, or within any county, city, township, or other municipality thereof, shall be deemed to be employed by or on behalf of the state of Kansas, or of such county, city, township, or other municipality thereof.

"SEC. 2. That all contracts hereafter made by or on behalf of the state of Kansas, or by or on behalf of any county, city, township, or other municipality of said state, with any corporation, person or persons, for the performance of any work or the furnishing of any material manufactured within the state of Kansas, shall be deemed and considered as made upon the basis of eight hours constituting a day's work; and it shall be unlawful for any such corporation,

person or persons to require or permit any laborer, workman, mechanic or other person to work more than eight hours per calendar day in doing such work, or in furnishing or manufacturing such material, except in the cases and upon the conditions provided in section 1 of this act.

"SEC. 3. That any officer of the state of Kansas, or of any county, city, township or municipality of said state, or any person acting under or for such officer, or any contractor with the state of Kansas, or any county, city, township or other municipality thereof, or other person violating any of the provisions of this act, shall for each offense be punished by a fine of not less than $50 nor more than $1,000, or by imprisonment not more than six months, or both fine and imprisonment, in the discretion of the court."

The fourth section provided it should not apply to existing contracts, and the fifth when it should take effect. Section 2 of the act is now R. S. 44-204, and section 3 is now R. S. 44-205. It will be observed that the title of this act pertained only to hours of labor and to providing penalties for the violation of the act. The only thing specifically characterized as being unlawful by the act (section 2) was requiring or permitting the laborer, workman, or mechanic to work more than eight hours except in case of emergency. The provision with reference "to current rate of per diem wages" was not referred to in the title, nor was its violation specifically made unlawful. Perhaps that proviso was inserted in the bill by an amendment when it was being considered in the committee of the whole, but its legislative history on that point is not clear. It is clear, however, that the framers of this bill, and the legislature which enacted it, did not intend to make the violation of that provision a criminal offense. Perhaps, as suggested by Judge Cardozo in *Campbell v. City of New York*, supra, it forms some basis or guide in civil litigation which might arise out of the contract or employment of workmen thereunder. Section 1 of the act was amended in 1913 (Laws 1913, ch. 220) by adding a provision that it should not apply to cities of the second and third class operating municipal light and water plants. As so amended it became paragraph 5870 of the General Statutes of 1915. The commission to revise our statutes, created under chapter 207 of the Laws of 1921, in making our Revised Statutes of 1923, revised this section as to its language and made two sections of it, being R. S. 44-201 and R. S. 44-202. In the first of these they corrected the language of the earlier section, and in the second they made it an offense for any officer of the state, or any municipality thereof having charge or control over such public work, to violate the provisions of the preceding section, and

provided the grade of the offense and the punishment. It created no offense as against the contractor or subcontractor. The commission created to revise our statutes was required to submit its revisions to the legislature for reënactment (Laws 1921, ch. 207, § 3), which it did in 1923 (Laws 1923, ch. 144). It was therefore authorized to revise those enacted by the legislature of 1921, or earlier sessions, but was not authorized to revise acts of the legislature of 1923, but simply incorporated those in the compilation of revised statutes: The legislature of 1923 (Laws 1923, ch. 157) amended paragraph 5870 of the General Statutes of 1915, which was section 1 of chapter 114 of the Laws of 1891, as amended by chapter 220 of the Laws of 1913, by adding further provisions that it should not apply to township or county work in dragging or grading dirt roads. The commission revising the statutes, being uncertain how to treat its revision of paragraph 5870 of the General Statutes of 1915 in two sections, as appear in R. S. 44-201 and 44-202 and chapter 157 of the Laws of 1923, referred the question to former Chief Justice Frank Doster, who had been employed by the commission in an advisory capacity. Judge Doster gave a written opinion that both should be printed (see Report on Editing and ·Compilation of Revised Statutes of 1923 by the Commission to Revise the Statutes, pp. 35, 98, 99). In accordance with this recommendation both were printed, and the act of the legislature of 1923 (Laws 1923, ch. 157) became R. S. 44-203. Naturally the title originally used in chapter 114 of the Laws of 1891 was omitted in the Revised Statutes of 1923, it being the practice of the commission to omit the titles of former legislative acts. Such titles may be referred to, however, when it is important in a study of the history of the legislative enactment to determine the meaning or intent of the legislature. When we conclude, as we have heretofore done, that the legislature of 1891 did not make, and did not intend to make, the violation of the provision in section 1 of that act pertaining to "the current rate of per diem wages" a criminal offense, but that it was placed in the statute as a standard of civil liability with respect to those matters to which it is applicable, can it be said that the manner in which the subject was treated by the commission to revise our statutes, and the legislature which enacted the revision, made its violation a criminal offense? Certainly it is not clear that such was the intention, and we feel constrained to hold that the violation of

that specific provision of the statute has not been made a criminal offense.

We are further persuaded in this view by the nature of the cases arising under this statute (Laws 1891, ch. 114) and its amendments which have reached this court. All of them dealt with the hours of labor provision of the statute (*State, ex rel., v. Martindale,* 47 Kan. 147, 27 Pac. 852; *In re Ashby,* 60 Kan. 101, 55 Pac. 336; *In re Dalton,* 61 Kan. 257, 59 Pac. 336; *Beard v. Sedgwick County,* 63 Kan. 348, 65 Pac. 638; *State v. Atkin,* 64 Kan. 174, 67 Pac. 519 (affirmed 191 U. S. 207) ; *State v. Wilson,* 65 Kan. 237, 69 Pac. 172; *State v. Ottawa,* 84 Kan. 100, 113 Pac. 391) except one, *State, ex rel., v. Construction Co.,* 99 Kan. 838, 162 Pac. 1175. That was an original proceeding in quo warranto in this court, brought in the name of the state on the relation of the attorney-general against a corporation which had a contract for constructing a bridge across the Kansas river in Wyandotte county. It was brought to oust the defendant from the corporate privileges or franchises of requiring laborers to work more than eight hours per day, and from paying laborers less than the current rate of per diem wages in the locality. The evidence before the court was by affidavit, which convinced the court that the requiring of laborers at a certain time to work more than eight hours a day was done only under an emergency, as defined in the statute. On the wage question the controversy was whether the current rate of wages for a certain class of workmen was sixty-five cents an hour, as contended by the state, or forty-five cents an hour, as paid by the defendant. The court held the burden of proof was on plaintiff and that it had not established the fact that the current rate of wages for workmen employed to do the work defendant was having done exceeded the amount it was paying. The case is important here for two reasons: *First,* that on the question involving the current rate of wages a civil action was brought by the attorney-general rather than a criminal action; and, *second,* it disclosed the difficulty, even in a civil action, of determining the current rate of per diem wages for the class of workmen employed and used by defendant.

Touching the second question raised by the motion to quash, that the information attempts to charge an offense in language so indefinite that defendants would be unable to prepare their defense, but little need be said. Naturally, in the construction of the build-

ing defendants employed laborers, workmen and mechanics of varying degrees of skill. Which of these are defendants charged with paying less than the current rate of per diem wages? What does the prosecution contend was the current rate of per diem wages for such persons, and what was paid by defendant? These are not stated in the information. How were defendants to know what specific charge was made against them? It is fundamental that an information should charge an offense with such certainty that the defendant may know the offense with which he is charged with such certainty as to perpare to meet it. The information in this case does not do that. It is true that when a statute creating an offense states the facts constituting it, the information may be in the language of the statute. But where the statute is in general terms only, the information should be more specific.

From what has been said above we conclude, *first,* that the provision in the statute to the effect that the contractor should not pay less than the current rate of per diem wages was not designed or intended by the legislature to form the basis of a criminal prosecution, but that its purpose was to form the basis of determining civil liability which might grow out of the relations of the parties; *second,* if it were intended to form the basis of criminal liability, it is void for uncertainty, under the authority of *Connally v. General Const. Co.,* supra; and, *third,* that the information itself was too indefinite to charge a specific offense.

The judgment of the court below is affirmed.