No. 32,545

THE STATE OF KANSAS, *Appellant,* v. GEORGE E. ROGERS, HERMAN A. HILL and JOHN F. MILLHAUBT, *Appellees.*

(52 P. 2d 1185)

Opinion filed December 7, 1935.

*Clarence V. Beck,* attorney general, *Earl B. Swarner,* assistant attorney general, and *Sidney L. Foulston,* county attorney, for the appellant.

*W. D. Jochems,* of Wichita, special prosecutor.

*H. W. Hart, A. V. Roberts* and *Jesse D. Wall,* all of Wichita, for the appellees.

The opinion of the court was delivered by

WEDELL, J.:   This was a criminal prosecution under the provisions of R. S. 19-242.

The state has appealed, and defendants cross-appeal. We shall refer to the parties as plaintiff and defendants. The case has not been tried on its merits. Plaintiff appeals from the order of the trial court sustaining motions to quash the indictment. Defendants, the county commissioners, have cross-appealed from the order sustaining a demurrer to their respective pleas in abatement. An appeal does not lie from the latter at this time. In the case of *State v. Levine,* 125 Kan. 360, 264 Pac. 38, it was held:

"In a criminal action, an appeal does not lie from an order   .   .   .   sus-

taining a demurrer to a plea in abatement filed against it until after trial on the indictment and a final judgment has been rendered."

Plaintiff had filed a motion to dismiss the cross-appeal. On oral argument plaintiff, however, consented to and in fact requested this court to determine the various issues raised by the cross-appeal under various pleas in abatement. We realize such rulings might materially facilitate the trial on its merits. If the issues so raised were decided now a precedent would be established whereby parties could agree to an appeal on similar matters and obtain rulings on almost every conceivable phase of a lawsuit in advance of the trial on its merits. This court in the Levine case considered advantages which might accrue by such practice under certain circumstances, but held unless the practice is authorized by statute the court should not recognize it. After careful consideration we have reached the same conclusion in the instant case. The cross-appeal must therefore be dismissed.

The grand jury of Sedgwick county returned an indictment against each of the three defendants in three separate counts for alleged violations of R. S. 19-242. That statute embraces three separate and distinct misdemeanors. The first deals with *allowance* of accounts, claims or demands, the second with the *issuance of warrants* therefor, and the third prohibits the issuance of warrants unless the account, claim or demand is prepared in certain form, presented and allowed as that portion of the statute directs. The prosecution here involves only the first part of the statute dealing with allowance of accounts, claims or demands. The first subdivision of R. S. 19-242 reads:

"It shall be unlawful for any board of county commissioners to allow any greater sum on any account, claim or demand against the county, than the amount actually due thereon, dollar for dollar, according to the legal or ordinary compensation or price for services rendered, salaries or fees of officers, or materials furnished."

In the first count defendant commissioners were charged in substance with unlawfully, etc., *allowing* a greater sum on an account, claim or demand against Sedgwick county, than the amount actually due thereon, dollar for dollar, according to the legal or *ordinary* compensation or price for services rendered or material furnished to said county, in favor of one W. G. Haun and Company, or W. G. Haun, individual, doing business as W. G. Haun and Company. In particular, they were indicted in this count *for allowing*

$6,337.50 for services of attorneys, and printing blank bonds on $422,500 refunding issue at $15 per thousand.

The second count dealt with the *allowance* of an account, claim or demand, in favor of said W. G. Haun, etc., in the sum of $1,500, for legal services and printing of $100,000 of emergency poor bonds.

The third count dealt with the *allowance* of an account, claim or demand, in favor of W. G. Haun, etc., in the sum of $1,266.60, for refunding certain other bonds.

The charging part of each count in the indictment is substantially the same. To each count is attached the particular account, claim or demand on which the prosecution is based, also the record of allowance by the commissioners and the voucher in payment thereof, indicating the particular fund to which it was charged.

Defendants challenge the form and the language in the indictment from its very beginning. The first count of the indictment, without exhibits attached thereto, reads:

"State of Kansas, Sedgwick County, ss:

"The grand jurors of the state of Kansas in Sedgwick county, duly impaneled, charged and sworn by the court aforesaid, at the January, 1935, term, on their oaths do find, charge and present that, on or about the 5th day of February, 1934, at Wichita, in the county of Sedgwick, state of Kansas, George E. Rogers, Herman A. Hill and John F. Millhaubt, duly elected, qualified and acting county commissioners in and for Sedgwick county, Kansas, then and there being, did unlawfully, intentionally, willfully and knowingly allow a greater sum on an account, claim or demand against said county than the amount actually due thereon, dollar for dollar, according to the legal or ordinary compensation or price for services rendered or materials furnished to said county in favor of one W. G. Haun and Company, or W. G. Haun, an individual doing business under the firm name and title of W. G. Haun and Company, which said accounts, claims or demands against said county of Sedgwick, in the state of Kansas, was in the words and figures as follows, to wit:" (Here follows copy of account, claim or demand, and copy of voucher.)

· The separate motions to quash the indictment are substantially the same. The grounds of the motions were constitutional, and that the indictment was indefinite, uncertain and bad for duplicity. We shall consider the last complaints first. It must be admitted the indictment could and should have been framed with greater definiteness and clarity. The statutes require the indictment to be in plain and concise language (R. S. 62-1004), and that it be direct and certain regarding the party and the offense charged. (R. S. 62-1005.)

Is this indictment so indefinite and uncertain as to actually leave the defendants in doubt as to the offense with which they are being charged? The offense is charged substantially in the words of the statute. This has been held sufficient. (*State v. Buis*, 83 Kan. 273, 111 Pac. 189; *State v. Lumber Co.*, 83 Kan. 399, 111 Pac. 484; *State v. Custer*, 85 Kan. 445, 116 Pac. 507.)

It will be seen two types of compensation are involved under the terms of this statute. The first is legal compensation or price. The second is ordinary compensation or price. Plaintiff has admitted in both the trial court and here defendants cannot be prosecuted under this indictment for allowing a greater sum than the amount actually due according to legal compensation. Plaintiff bases the prosecution on the proposition that an account, claim or demand was allowed for a greater sum than actually due thereon according to the *ordinary* compensation.

Is the indictment bad for duplicity? Duplicity consists in charging more than one offense in the same count of the information or indictment. Complaint is made concerning the use of the disjunctive "or" in the phrase "account, claim or demand," and concerning the use of the same disjunctive "or" between the words "compensation" and "price." The words, "account," "claim," and "demand" are not charging words in the statute or indictment. They are nouns. True, they are not in legal contemplation synonymous. In the instant case can there be any question in the minds of defendants concerning the general transaction with which they are being charged? The transaction on which the allowance was made is attached to the indictment. It fully apprised the defendants, irrespective of whether in legal contemplation it constitutes an account, claim or demand. Now, as to the disjunctive "or" between the words, "compensation" and "price," these words are not charging terms. They are also nouns. While the word "compensation" and the word "price" are not technically synonymous, they are practically so used in the statute. To be sure, it would have been better pleading to have used the conjunctive "and." It is equally certain defendants can in no wise be misled by the use of the word "or" in this instance.

In the light of these circumstances the principle announced in the case of *State v. Douglas*, 124 Kan. 482, 260 Pac. 655, is applicable here, syllabus one of which reads:

"The overruling of a motion to quash a count in an information because

the disjunctive 'or' is used in the charging clause instead of the conjunctive 'and,' when it follows the language of the statute and refers to things as objects rather than the doing of things, and where it is used between synonymous words or terms rather than distinct alternatives, is not reversible error."

In the same case this court quoted from 30 Cyc. 1565, as follows:

"The offense of practicing medicine without a license being purely a statutory offense, if the statute so far individuates the crime that the offender has proper notice of the nature of the charge against him, it is sufficient to charge it in the language of the statute or in terms substantially equivalent thereto." (p. 484.)

Similar objections were raised in the form of a plea of abatement in the case of *State v. Schweiter,* 27 Kan. 499, and this court said:

"In the case of misdemeanor, the joinder of several offenses will not in general vitiate the information in any stage of the prosecution. For offenses inferior to felony, the practice of quashing the information on account of such joinder, or calling on the prosecutor to elect on which charge he will proceed, does not prevail." (Syl. ¶ 4.)

It is further contended the indictment in this case is bad for duplicity because attached to it is the warrant issued in payment of the account, claim or demand. The gist of this action is the *unlawful allowance* of the account, which is set out in detail. There is no charge for unlawfully issuing the warrant. Under these circumstances the only function of the warrant is that it shows the completion of the offense of allowing a greater sum. The most that can be said against the attachment of the warrant to the indictment is that it constitutes surplusage. It does not violate the rule against duplicity.

Our attention is further directed to the fact that each of the offenses is charged as of the date of the warrant in payment of the account, rather than as of the date of the allowance of the account. This constitutes a discrepancy of a few days. The indictment reads, "on or about." The matter complained of did not render the indictment fatally defective. Furthermore, the defendants cannot be prosecuted under this indictment for the offense of issuing the warrants. This, as previously indicated, constitutes a separate offense under R. S. 19-242, and is not pleaded.

It will be observed we have denominated the transaction as an account. The verified statement filed for allowance is designated as an account under each of the respective counts of the indictment.

Defendants further contend each count of the indictment shows on its face that the respective allowances were made pursuant to a

written contract. They insist the written contract not being made a part of the indictment renders the indictment subject to a motion to quash. We do find in the statement attached to the third count the phrase, "to attached bill as per contract." Let us assume, without deciding, there was a written contract covering the allowances made under each of the counts, that fact would not necessarily make good the motion to quash. In other words, the fact in and of itself, if it be a fact, that defendants had previously entered into a valid, binding and enforceable contract against the county would not necessarily cure an unlawful act of allowing the bill when presented if the allowance was in fact unlawful, under the provisions of R. S. 19-242. It follows the motion to quash does not quite reach the point.

Other complaints are made concerning the indictment. Some of them might well have been observed by the pleader. They are not considered sufficiently important to render the indictment fatally defective.

The motions to quash also challenged the indictment on constitutional grounds. The gist of the offense charged is the *allowance* of a greater sum on an account than the amount actually due thereon, dollar for dollar, according to the *ordinary* compensation or price. The complaint concerns the word "ordinary."

The specific complaints made by defendants against this statute are, it does not forbid a specific or definite act, it provides no ascertainable standard of guilt, and the jury must guess at its meaning and differ as to its application.

Defendants contend the statute under which the indictment is drawn is contrary to and in conflict with the fifth amendment to the constitution of the United States, in that it deprives defendants of liberty without due process of law; that it violates the fourteenth amendment of the federal constitution, and especially that part thereof which provides that no state shall deprive any person of life, liberty or property without due process of law, or deny any person within the jurisdiction the equal protection of the law, and that it violates that part of section ten of the bill of rights of the constitution of the state of Kansas which reads:

"In all prosecutions, the accused shall be allowed . . . to demand the nature and cause of the accusation against him."

The trial court held the statute unconstitutional on the ground it was antagonistic to the above-quoted part of section ten of the

bill of rights of the constitution of this state; and was therefore void. In support of this decision the trial court cited *State v. Blaser*, 138 Kan. 447, 26 P. 2d 593; *Connally v. General Const. Co.*, 269 U. S. 385, 70 L. Ed. 322, 46 S. Ct. 126; *State v. Satterlee*, 110 Kan. 84, 202 Pac. 636; *United States v. Cohen Grocery Co.*, 255 U. S. 81, 65 L. Ed. 516, 41 S. Ct. 298; *United States v. Willard*, 8 F. Supp. 356. In addition to these cases defendants cite numerous decisions. Among them are *Schechter Poultry Corp. v. United States*, 295 U. S. 495, 79 L. Ed. 888, 55 S. Ct. 837; *Champlin Rfg. Co. v. Commission*, 286 U. S. 210, 76 L. Ed. 1062, 52 S. Ct. 559; *Chicago & N. W. Ry. Co. v. Dey*, 35 Fed. 866; *Tozer v. United States*, 52 Fed. 917; *International Harvester Co. v. Kentucky*, 234 U. S. 216, 58 L. Ed. 1284, 34 S. Ct. 853; *Christy-Dolph v. Gragg*, 59 F. 2d 766.

It may be stated here that in none of the cases above mentioned was the decision based upon the use of the word "ordinary" except in one case. The case in which the word "ordinary" was employed is the recent case of *United States v. Willard*, 8 F. Supp. 456. The above cases relied on by the trial court and those cited by defend-. ants are all entitled to and have received our most careful study and consideration. The case of *United States v. Cohen Grocery Co.* was cited by this court in *State v. Satterlee*, and the case of *Connally v. General Const. Co.* was cited by this court in the case of *State v. Blaser*. It is also true these last two decisions of the supreme court of the United States were considered not only persuasive but almost conclusive in their application to the particular statutes there under consideration. Those cases, however, did not involve the use of the word "ordinary," which this court believes to have a generally well-understood meaning. In the instant case we are confronted squarely with the use of the word "ordinary" as employed in a statute enacted in 1868. True, its constitutionality has not been previously questioned. Various decisions, in both criminal and civil cases, have, however, been rendered pursuant to the provisions of this statute. We understand that age does not invest it with constitutional validity. Neither does it rob it of such validity. That it is a most wholesome statute in connection with the administration of county government cannot be questioned. Its design and purpose was the prevention of extravagance, waste and fraud in the administration of public affairs. It should be upheld unless its infringement of the constitution is clearly established. In the case of *United States v. Standard Brewery*, 251 U. S. 210, 64 L. Ed. 229,

40 S. Ct. 139, it was said that a congressional enactment "must be construed, if fairly possible, so as to avoid not only the conclusion that it was unconstitutional, but also grave doubts upon that score." To the same effect are *Atchison v. Bartholow*, 4 Kan. 124; *State v. Scott*, 109 Kan. 166, 197 Pac. 1089.

Defendants urge the Blaser case, decided by this court, is conclusive in the instant case. Defendants were there charged with violation of R. S. 1931 Supp. 44-201, in that while constructing a school building in the city of Wichita, under a contract with the board of education of that city, defendants did "employ laborers and other persons at a less wage than the current rate of per diem wages in the locality said work and labor was performed." The statute above referred to, among other things, provides not less than the current rate of per diem wages in the locality where the work is performed shall be paid to laborers or other persons so employed on contracts with the state, or its municipalities, for construction work. The statute contains a definition for the word "locality," and for the phrase "the current rate of per diem wages."

In discussing the above statute, this court cited an identical statute of Oklahoma, and quoted from *Connally v. General Const. Co.*, 269 U. S. 385, 70 L. Ed. 322, 46 S. Ct. 126:

"A criminal statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must guess at its meaning and differ as to its application, lacks the first essential of due process of law." (*State v. Blaser*, 138 Kan. 447, 448.)

This court still adheres to that pronouncement. Can men of common intelligence, which county commissioners are presumed to have, know or ascertain what constitutes ordinary compensation or price for services rendered or materials furnished to the county?

Perhaps no single word has a more definite meaning in legal parlance or in the language of the street, than the word "ordinary." In the Connally case, cited by this court in the Blaser case, the supreme court of the United States itself employed the word "ordinary," when it held the wage act unconstitutional for lack of definiteness. The phrase of the wage act in dispute was "not less than the current rate of per diem wages in the locality." In the course of its opinion that court said:

"That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with *ordinary notions of fair play* and the settled rules of law." (Italics ours.) (p. 391.)

Later in the opinion the court further said:

"The crime, and the elements constituting it, must be so clearly expressed that the *ordinary person* can intelligently choose, in advance, what course it is lawful for him to pursue." (p. 393.)

Now what did that court mean when it used the word "ordinary" in defining the degree of definiteness and clarity required by a criminal statute? Can it be assumed that court in criticizing the indefiniteness of the statute involved, used a term as indefinite as the statute it criticized? We think not. The court there defined the degree of definiteness required in a criminal statute. In so doing it employed the very term which in the instant case is challenged for indefiniteness. Are the words "ordinary person" any less definite than the words "ordinary compensation or price." We think not.

We also call attention to the fact that the author of our Blaser case painstakingly narrated the history of the wage-law act in this state, and showed conclusively that it was never intended as a criminal act from its very inception. This court did hold the indictment too indefinite in the Blaser case. In that connection this court, in part, said:

"Naturally, in the construction of the building defendants employed laborers, workmen and mechanics of varying degrees of skill. Which of these are defendants charged with paying less than the current rate of per diem wages?" (p. 455.)

That uncertainty and indefiniteness does not inhere in the indictment under consideration. There is, according to the indictment in the instant case, only one party to whom allowances were made by the defendant commissioners, and that party is Haun.

In the same case this court further said:

"What does the prosecution contend was the current rate of per diem wages for such persons, and what was paid by defendant? These are not stated in the information. How were defendants to know what specific charge was made against them? It is fundamental that an information should charge an offense with such certainty that the defendant may know the offense with which he is charged with such certainty as to prepare to meet it. The information in this case does not do that. It is true that when a statute creating an offense states the facts constituting it, the information may be in the language of the statute. But where the statute is in general terms only, the information should be more specific." (p. 456.)

We still adhere, also, to that statement. The portion of section ten of the bill of rights in the Kansas constitution, reads:

"In all prosecutions, the accused shall be allowed, . . . to demand the nature and cause of the accusation against him."

We are here confronted squarely with the question whether the phrase "ordinary compensation or price" sufficiently meets the above requirement. We believe it does. Since the statute is in general terms only, it would have been better pleading to have also alleged what the state regarded as ordinary compensation or price. On the other hand, since we believe the word "ordinary" meets the constitutional requirements, the motion to quash should not be sustained by reason of the absence of a fuller statement.

In *State v. Satterlee,* 110 Kan. 84, 202 Pac. 636, this court had under consideration that part of section 3814 of the General Statutes of 1915 which prohibited a person from *carelessly or negligently handling or exposing nitroglycerin.* This court held the statute unconstitutional for the reason that it did not name the acts which are prohibited by law. This court cited the case of *United States v. Cohen Grocery Co.,* supra, and in discussing the question said:

"This decision from the highest and ablest court in the land on a statute in principle so closely parallel to the one now under consideration that it is difficult to draw distinctions between them is very persuasive and is almost conclusive." (p. 87.)

The same difficulty of distinction does not exist in the case at bar. In the Satterlee case the charging phrase, following the statutory language, was: "Carelessly and negligently handle and expose." The object was nitroglycerin. Clearly the charging phrase was not sufficiently definite as it did not name the acts prohibited. The words "carelessly" and "negligently" modifying the charging words "handle" and "expose," left much room for speculation as to what act or acts were really prohibited. In this case the precise charging word is "allow." No difficulty is presented concerning the meaning of that term as used in the statute. In the instant case the object of allow is "compensation" or "price," modified by the generally and commonly understood word "ordinary."

The only case cited—and our search has revealed no other—in which the word "ordinary" was employed and challenged, is the case of *United States v. Willard,* 8 F. Supp. 356, decided in September, 1934. The court there had under consideration the following statute:

"No person, partnership, association, or corporation, shall make any charge in connection with a loan by the corporation, or an exchange of bonds or cash advance under this chapter except *ordinary charges authorized and required*

*by the corporation* for services actually rendered for examination and perfecting of title, appraisal, and like necessary services." (Italics ours.)

It will be observed the phrase "ordinary charges" is modified by the phrase or expression "authorized and required by the corporation." The court quashed the indictment against Willard. The corporation at that time had made no regulations relative to charges. It is therefore clear that no prosecution could have been instituted against Willard at that time under the provisions of that act. The act itself required that the corporation should determine what constituted ordinary charges. Since the act itself required the corporation to determine what constituted ordinary charges, and since the corporation had not yet determined that fact, the statute itself was to that extent incomplete and indefinite. The federal district court in that connection said:

"Regardless of the proper construction of the statute after the promulgation of regulations, it seems clear that until 'ordinary charges' are regulated and defined by the corporation the statute is lacking in that certainty which is required to uphold criminal statutes and indictments thereunder against attack for vagueness and indefiniteness." (p. 357.)

In the light of the entire record in that case we do not construe the decision as conclusive in the instant case.

Defendants earnestly contend the decision of the supreme court of the United States in the NRA case, *Schechter Poultry Corp. v. United States,* 295 U. S. 495, 79 L. Ed. 888, 55 S. Ct. 837, is applicable and decisive in this case. We are inclined to the view the case is neither, applicable nor decisive here. Section three of the NRA act provided that upon application to the President by a trade or industrial association, the *President might approve a code of fair competition,* etc. Violation of the code was made a crime. It was contended by the defendants that the act of congress providing for the code was unconstitutional in that it furnished *no standards* for any trade or industry. In upholding this contention that court, in part, said:

"To summarize and conclude upon this point: Section 3 of the recovery act (15 USCA sec. 703) is without precedent. It supplies no standards for any trade, industry, or activity. It does not undertake to prescribe rules of conduct to be applied to particular states of fact determined by appropriate administrative procedure. Instead of prescribing rules of conduct, it authorizes the making of codes to prescribe them. For that legislative undertaking, section 3 sets up no standards, aside from the statement of the general aims of rehabilitation, correction, and expansion described in section 1. In view of

the scope of that broad declaration and of the nature of the few restrictions that are imposed, the discretion of the President in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country, is *virtually unfettered. We think that the code-making authority thus conferred is an unconstitutional delegation of legislative power.*" (p. 541.)   (Italics ours.)

From the above statement it would clearly appear the decision was not based upon an indefinite regulation or code, which had been enacted or promulgated, for that had not yet been done. The gist of the decision is that the act of congress was virtually an unfettered delegation of legislative power by congress, the constituted legislative body, to the chief executive in charge of a nonlegislative department of the federal government. It was the delegation of legislative power completely devoid of all standards for such legislation that was declared unconstitutional. In the instant case the statute was enacted by properly constituted authority. It set a standard for what the commissioners could properly allow. The standard was ordinary compensation or price. The question before us now is not whether there was any standard, but whether the standard fixed by properly constituted authority is sufficiently definite.

Plaintiff's contention concerning the constitutionality of the act in question may be summarized as follows:

"1. That the statute, R. S. 19-242, is as specific as is compatible with the subject matter legislated upon.

"2. That the word 'ordinary' is not indefinite and uncertain and the courts of the land have had no difficulty in defining the word 'ordinary,' nor in using it as an adjective modifying nouns.

"3. That because the fact of violation of the statute may depend upon the judgment of a court or jury, and not upon specific criteria contained in the act itself, this will not invalidate the act.

"4. That one jury may convict and another acquit upon the same state of facts does not invalidate the act."

R. S. 1933 Supp. 8-122 is our present traffic statute. Its violation constitutes a misdemeanor. It is probably as indefinite as any law in the statute books. The pertinent portion thereof reads:

"That no person shall operate a motor vehicle on any highway outside of a village or city at a rate of speed greater than *is reasonable and proper,* having regard for the traffic and use of the road and the conditions of the road, nor at a rate of speed such as to endanger the life or limb of any person; and within any city or village no motor vehicle shall be operated at a rate of speed greater than *is reasonable and proper,* and having regard for the traffic and use of the road and the condition of the road, nor at a rate of speed such as to endanger the life or limb of any person. . . . Every such motor

vehicle while in use on public highways shall be provided with *good and sufficient brakes,* and also with a suitable *bell, horn or other signal.* Any person violating the provisions of this section shall be deemed guilty of a misdemeanor, . . ."

No specific rate of speed is mentioned which makes prima facie evidence of negligence. In the case of *State v. Blake,* 133 Kan. 152, 298 Pac. 748, the specific charge under which defendant was found guilty was that of operating an automobile on a public highway at a greater rate of speed than was reasonable, and at such speed as to endanger the life or limb of a person using the highway. True, the constitutional question was not raised. It has been raised and upheld, however, in other states which have traffic statutes similar to ours. The same identical objections were made there that are being made here to the word "ordinary" contained in R. S. 19-242.

When a statute and indictment are sufficiently definite to advise defendant of the nature and cause of accusation against him we think the fact that one jury might convict and another acquit is not ground for holding the statute unconstitutional.

In the case of *Mulkern v. State,* 176 Wis. 490, 187 N. W. 190, it was said:

"It is claimed that the statute under which defendant was convicted was too vague and uncertain to sustain a conviction, in that it is impossible for the driver of a car to know whether or not he is violating it; that the fact of violation depends upon the judgment of a court or jury, and not upon specific criteria contained in the act itself; that one jury may convict and another acquit upon the same state of facts. This is true, and defendant relied upon cases from Georgia, in which a similar statute has been held void for uncertainty. (See *Hayes v. State,* 11 Ga. App. 371, 75 S. E. 523; *Holland v. State,* 11 Ga. App. 769, 76 S. E. 104; and *Elsbery v. State,* 12 Ga. App. 86, 76 S. E. 779.) *If the fact that one·jury might decide a case one way and another jury a different way upon the same state of facts rendered laws void for uncertainty, then we would have to discard not only many rules of civil law but also many criminal laws.* In nearly every criminal act an intent to commit it must be found in order to warrant a conviction. Not only may such intent be found upon circumstantial evidence, but the direct evidence may well give rise to a situation where one jury will find the intent and another fail to find it. So, too, in many cases where guilty knowledge is required to be found, as in receiving stolen goods or in running a house of ill fame, juries may come to different conclusions upon the same state of facts. Even in murder of the second degree the definition of the crime is no more specific and certain than is that of the offense in the statute under consideration. It provides that the killing of a human being without intent to kill, 'when perpetrated by any act *imminently dangerous* to others and evincing a depraved mind, regardless of human life,' shall be murder in the second degree. What is an act *imminently*

*dangerous* to others, and what evinces a depraved mind, regardless of human life, is as much a matter of judgment as is such reckless driving as will, under the circumstances, endanger the property, life or limb of any person. Thus, by sec. 4363, Stat. 1921, the involuntary killing of a human being by the culpable negligence of another is made manslaughter in the fourth degree. Juries may well differ as to what constitutes culpable negligence, yet a conviction thereunder is valid. *Likewise, in the law of negligence, what constitutes a lack of ordinary care is a matter of judgment, the result of which is often followed by consequences far graver than is a violation of the statutes in question.* It is, of course, desirable that laws should be made as *specific as is compatible with the subject matter legislated upon.* A speed of so many miles per hour is specific and meets the requirements of many situations, but not of all, even though the rate for country and city driving is made different, as it usually is. Many situations may arise, both in the country and in the city, where the statutory speed would be reckless driving. To meet these situations the statute in question was enacted. We regard it as a very wholesome and sensible statute; one that calls upon every driver of a motor vehicle to, at all times, exercise such care as will reasonably insure the safety of the life and property of others; one that will supply the defects in laws regulating speed at so many miles per hour. We have a similar statute as to manslaughter in the fourth degree under section 4363, which provides that every other *killing of a human being by* the *act, procurement,* or *culpable negligence* of another, where such killing is not justifiable or excusable, or is not declared, . . . 'murder or manslaughter of some other degree, shall be deemed manslaughter in the fourth degree.' It is a *dragnet statute,* one that defines by exclusion rather than by inclusion, to the end that no culpable killing of a human being shall go unpunished. So, here, we have a salutary statute requiring the exercise of reasonable care at all times in the operation of such dangerous machines as are the vehicles described in the statute. *It covers situations not possible to cover by specific speed limits, and it is as definite and certain in its terms as the subject matter will permit.* It is not as drastic in its penalties as are many laws, no more definite in the description of offenses, that have for years been enforced as valid laws." (Italics ours.) (p. 492.)

Another well-reasoned opinion on the constitutionality of an indictment challenged for indefiniteness and uncertainty is found in the case of *State v. Schaeffer,* 96 Ohio St. 215, L. R. A. 1918B, 945, 117 N. E. 220. This Ohio case also treats so thoroughly all the principal contentions made by defendants that we are constrained to quote somewhat at length. The opinion, in part, reads:

"The fifth assignment of error urges that the statute, section 12603, general code, is unconstitutional and void for the reason that it does not observe the constitutional guaranty of sufficiently advising the defendant of the nature of the accusation against him, in that the statute is too indefinite and uncertain in its terms.

"It is claimed that the words 'reasonable' and 'proper' are so general, comprehensive, and variable that it would be impossible for the defendant to know,

or for the jury to fairly determine, what was a violation of the statute; that juries in one case would hold a speed to be reasonable, while the same speed under the same circumstances might be held by another jury in the same county, at the same term, to be unreasonable. In short, it is urged, that the statute should definitely fix what is a reasonable speed and a proper operation of a car.

"The constitutional guaranty is in very broad terms. It is the defendant's right 'to demand the nature and cause of the accusation against him, and to have a copy thereof.'

"*The degree of particularity and specification required in the indictment is not fixed by the constitution, but rather is fixed by the decisions of our courts.* There can be no violation of the constitutional provision in this respect, by reason of the generality and indefiniteness of any averment set forth in the statute, *so long as the indictment does advise the accused of the 'nature and cause of the accusation.'* Yet courts have nullified statutes because the language was too uncertain and too indefinite to ascertain the meaning of the legislature, and also because the language did not in any wise advise the public as to what was or what was not an offense under it.

"The legislature, however, in this instance, saw fit to fix no definite rate of speed for the car, except to require that the car should not be operated at a speed 'greater than is reasonable or proper, having regard for width, traffic, use, and the general and usual rules of such road or highway, or so as to endanger the property, life or limb of any person.'

"*In short, the legislature wrote into the statute what has become known as the 'rule of reason' ever since the Standard Oil and* tobacco trust cases were decided by the supreme court of the United States. (221 U. S. 1, 221 U. S. 107.)

"In those cases the supreme court of the United States read into the statute the so-called 'rule of reason,' holding that the antitrust act really was not a denial of all restraint of trade, but only a denial of unreasonable restraint of trade.

"*It would hardly be suggested that the supreme court of the United States read into the statute something that made the statute unconstitutional, or read into the statute something that made it so indefinite and uncertain that it was incapable of advising the public as to what was or was not an offense under it, or that made the statute practically unenforceable.* And yet, by parity of reason, it is claimed in this case that the legislature which wrote into the statute the same 'rule of reason' thereby in effect nullified such statute, because of the indefiniteness and uncertainty of its terms. The contention is not sound. The suggestion that juries on the same state of facts may hold one way in one county, and another way in another county, indeed, that in the same county upon the same state of facts one jury may hold one way and another hold another way, is no argument against this contention. That is inevitable under any system of jurisprudence on any set of facts involved in a criminal transaction. Courts differ in *their judgment,* juries differ in their judgment, but that is no reason for the abolition of either, or for denying them jurisdiction sufficient to enforce the administration of statutes like the one in question. In our whole criminal procedure, even in capital and the most atrocious cases, where a man's life and liberty for life are involved, it is made the special province and duty of juries to determine what is 'reasonable,' and

whether or not there is a 'reasonable' doubt of the defendant's guilt. Of course that is a conclusion—almost incapable of precise and specific definition. What one jury might hold to be a reasonable doubt, another jury would hold the contrary; and still there is no way other than to leave the question to the jury to determine what is and what is not a 'reasonable doubt.'

"Again, one of the most common defenses interposed in prosecutions for murder is that of self-defense. It is the settled law of this state, as in most others, that if the defendant at the time of the killing bona fide believed himself to be in danger, whether he was or not, and had 'reasonable' grounds for so believing, and used force pursuant to such situation, it is excusable homicide; and yet it is for the jury to put themselves in the situation of the parties, particularly that of the defendant, and determine from the evidence as to whether or not the defendant had 'reasonable' grounds. And so it is throughout our entire criminal jurisprudence. . . .

"Section 12-603 is as definite and certain on the subject matter and the numerous situations arising thereunder as the nature of the case and the safety of the public will reasonably admit." (pp. 228, 231, 236.)

It would appear R. S. 19-242 is as definite and certain in its terms as the subject matter will permit. County commissioners have numerous and sundry purchases which must be made and contracts which must be let. The statute could not include the exact amounts to be paid for hundreds of various types of articles which must be purchased. Clearly the statute could not include exactly what the commissioners should pay, as plaintiff suggests for brooms, janitors' supplies, automobile tires, trucks, printing or other articles. Can it be fairly said that public officials would really have practical difficulty in ascertaining what constitutes ordinary compensation or price for services rendered or materials furnished? True, there might be some slight variation. It is suggested that public officials would be subject to prosecution for the slightest departure from the letter of the law. The principle that the spirit rather than the exact letter of the law prevails, has been previously announced. In *State v. Bush,* 47 Kan. 201, 27 Pac. 834, it was said:

"A departure from some directory provision, made without fraudulent intent, and which in its nature and effect cannot injure anyone or operate to defeat or interfere with the purpose of the act, cannot be regarded to have been in the mind of the legislature in prescribing the penalties of the act. Although such departure appears to be within the strict letter of the act, a consideration of the mischief intended to be prevented, the remedy proposed, and the punishment provided, indicate clearly that such was not the intention of the makers of the statute. It has already been held that, when the intention of the legislature can be discovered, it should be sensibly followed, although such interpretation may seem contrary to the letter of the statute. (Intoxicating Liquor Cases, 25 Kan. 751, 762)." (p. 205.)

Our homicide statutes, particularly R. S. 21-407, 21-414, 21-416, 21-418 and 21-420, where the words "culpable negligence," "negligently," and "state of intoxication" are used in defining different degrees of homicide, have been previously invoked. Culpable negligence has been defined as the want of such care as a man of *ordinary* prudence would use under similar circumstances, and as the want of that usual and *ordinary* care and caution in the performance of an act usually and *ordinarily* exercised by a person under similar circumstances and conditions, and as substantially equivalent to "actionable negligence," and also as equivalent to "criminal negligence." (45 C. J. 632; *C. K. & N. Rly. Co. v. Brown,* 44 Kan. 384, 390, 24 Pac. 497.) In the case of *State v. Bailey,* 107 Kan. 637, 193 Pac. 354, defendant was convicted of manslaughter on a charge of culpable negligence in driving an automobile.

The word "ordinary" is employed in other statutes. R. S. 66-261 requires railroads to have a headlight that will outline the figure of a man at a distance of 800 feet under *ordinary* night conditions. Its violation is a misdemeanor. (R. S. 66-262.) R. S. 58-101 is our bulk-sales statute. By its provisions the sale or disposal of any part or the whole of a stock of merch'andise or the fixtures pertaining thereto otherwise than in the *ordinary* course of his trade or business is void as against his creditors unless certain requirements are complied with as specified by the statute. Its violation constitutes a misdemeanor. (R. S. 58-103.) No difficulty was encountered in applying the word "ordinary" in *Oil Co. v. Consolidated Companies,* 110 Kan. 245, 203 Pac. 915. It is doubtful whether any other single word has such common usage and is so universally applied and understood.

In Funk & Wagnall's Standard Dictionary, twentieth century edition, the word "ordinary" is defined as an adjective, and meaning: (1) of common or everyday occurrence; customary; usual; as, an ordinary amount of business. (2) According to an established order; methodical; regular; normal.

In 3 Words and Phrases (second series) we find definitions of the word "ordinary" as modifying the following words: Acts, appliances, baggage, business, calling, care, caution, circumspection, clerk, course of business, course of law, current expenses, debts, diligence, docility, expenses, floods, language, low-water mark, luggage,

negligence, probate proceedings, prudent, rainfall, repairs, risk, skill, state business, tax, tenancy, thread, time, travel, use, wear and tear.

In the original edition, in addition to the words above defined, we find the word "ordinary" as an adjective modifying the following words: And yearly taxes, bank deposits, cattle, circumstances, course of practice, courts of law, domestic business, expenditure, fences, form, grant, inspection, jurisdiction, low water, man or person, method, navigation, neglect, observation, place, precaution, process of law, purchaser, purposes, service, stage of water, stock, tides, use, work, yearly taxes.

In the third series of Words and Phrases, in addition to the words above defined, we find the word "ordinary" as an adjective modifying the following words and phrases: Cash dividends, discharge or release, handling, hazards, high tide, high-water mark, kerosene, means of signaling, needs of city, partnership, plantation purposes and revenue.

In contradistinction to the word "ordinary" is the word "extraordinary" defined in the same dictionary as, (1) Being beyond or out of the common order or method; exceeding the ordinary degree; not ordinary; unusual; . . . (2) Employed for an exceptional purpose or on a special occasion; as a noun it is defined as, (1) Something extraordinary; especially, an extraordinary expense or allowance; specifically (Eng.), any allowance made to troops beyond the customary gross paid.

In the case of *Ellis v. United States*, 206 U. S. 246, 51 L. Ed. 1047, 27 S. Ct. 600, the eight-hour law was held to be constitutional, and the supreme court had no difficulty in determining what was an "extraordinary emergency," nor in upholding an instruction that if the defendant intended to permit the men to work over eight hours on the calendar day named that he intended to violate the statute *notwithstanding that he may have been mistaken as to what constituted an emergency extraordinary.* (Italics ours.)

In the case of *Balt. & Ohio R. R. v. Int. Com. Comm.*, 221 U. S. 612, 55 L. Ed. 878, the law regulating hours of railway employees was assailed upon the ground that the exception of cases of *emergency* made the application of the act so uncertain as to destroy its validity. In denying this contention the supreme court said:

"It is said that the words, 'except in case of emergency,' makes the application of the act so uncertain as to destroy its validity. But this argument in substance denies to the legislature the power to use a generic description, and,

if pressed to its logical conclusion, would practically nullify the legislative authority by making it essential that legislation should define, without the use of generic terms, all the specific instances to be brought within it. In a legal sense there is no uncertainty. Congress, by an appropriate description of an exceptional class, has established a standard with respect to which cases that arise must be adjudged." (p. 620.)

Therefore it can be seen that the supreme court of the United States has permitted congress to define by using generic terms and not requiring that all specific instances be brought within it.

From what has been said it follows the order sustaining the motion to quash must be reversed. The cross-appeal is dismissed.