No. 34,253

THE STATE OF KANSAS, *Appellee,* v. JOHN CARR, *Appellant.*

(98 P. 2d 393)

Opinion filed January 27, 1940.

*Russell C. Hardy,* of Kansas City, for the appellant.

*Jay S. Parker,* attorney general, *A. B. Mitchell,* assistant attorney general, *Arthur J. Stanley, Jr.,* county attorney, and *T. P. Palmer,* assistant county attorney, for the appellee.

The opinion of the court was delivered by

THIELE, J.: Defendant was convicted of a violation of the crimes act and appeals, specifying as errors the matters hereafter discussed.

The prosecution was had under the italicized part of G. S. 1935, 21-818:

"Any person or persons whomsoever who may be charged with holding any election in this state, authorized by law, who shall willfully and knowingly

receive any vote offered by any person who is not a resident in good faith of this state at the time of offering to vote, or who shall have voted previously at the same election, *or any person who shall knowingly and willfully commit any irregularity or fraud whatever with the intent to hinder, prevent or defeat a fair expression of the popular will, shall be deemed guilty of felony, and upon conviction thereof shall be punished by imprisonment and hard labor for a term not less than one year nor more than three years."*

The first information filed against the defendant and four other persons charged an offense in statutory language. It need not be noticed further, for an amended information was filed which read as follows:

"Arthur J. Stanley, Jr., as county attorney in and for the county of Wyandotte, in the state of Kansas, prosecuting for and on behalf of said state, within the county of Wyandotte, and in the name, and by the authority, and on behalf, of the said state of Kansas, now, here, in and to the district court of said county of Wyandotte, and state of Kansas, information gives that at said county of Wyandotte, state of Kansas, within the jurisdiction of this court, on or about the 3d day of November, 1936, one E. A. Jones, one John Carr, one Dick Smith, one Mike Hotujac and one Mary Hotujac, did knowingly, willfully and feloniously commit irregularity and fraud, with the intent, then and there to hinder, prevent and defeat a fair expression of the popular will at a general election held in precinct No. 1, Quindaro township, Wyandotte county, Kansas, on November 3, 1936; in that the said E. A. Jones, the said John Carr, the said Dick Smith, and the said Mike Hotujac and the said Mary Hotujac did, knowingly, willfully and feloniously mark and prepare approximately three hundred official ballots, a more accurate count of which cannot be given, in such a manner as to make it appear that said ballots had been marked and prepared for voting by the voters of said precinct; and did knowingly, willfully and feloniously deposit the ballots, by them marked and prepared as aforesaid, in a box resembling an official ballot box; and did knowingly, willfully and feloniously substitute the said box, containing the ballots marked and prepared by them as aforesaid, for the official ballot box containing the ballots voted by the voters of said precinct at said election; and did knowingly, willfully and feloniously substitute the ballots marked and prepared by them as aforesaid for the ballots voted by the voters of said precinct at said election; contrary to the statute in such case made and provided."

By motion to quash the amended information, objection to the introduction of evidence, motion for a directed verdict and for discharge of the defendant, motion in arrest of judgment and motion for a new trial, the defendant raised the questions of the constitutionality of the statute and the sufficiency of the information. Although defendant assigns as error the ruling on his motion to quash the amended information, in his brief he states his belief the trial court was correct in its ruling, and that assignment will not be

discussed. We shall first take up the question of the statute and whether defendant was properly charged under it.

It may be observed here that defendant was not a person charged with holding any election. Defendant calls our attention to the fact that in the above statute as enacted in 1859 there was a comma after the word "whatever" omitted in the revision of the statutes in 1868 and subsequent revisions and publications, and from that he argues that the person who shall "commit any fraud or irregularity" must be one charged with holding an election. The act in question was first enacted at the third session of the territorial legislature in 1857 and appeared as Laws Kansas Territory (third session), chapter 1, section 2. It is not necessary to note changes wrought by succeeding legislatures to make the act refer to the state rather than the territory. In the original act that part reading "or who shall have voted previously at the same election" was followed by a semicolon which clearly set off the preceding part of the section from that portion under which the present prosecution was had. We do not believe the fact that in later enactments, viz., Laws Kan. Terr. 1859, ch. 28, sec. 210; G. S. 1868, ch. 31, sec. 219; R. S. 1923, 21-818, and G. S. 1935, 21-818, a comma was substituted for the semicolon, and the comma after the word "whatever" was omitted, changed the sense of the statute in any particular. The person to be charged under the latter part of the statute did not have to be one charged with holding the election.

It is also contended the section violates article 2, section 16 of the state constitution in that there are two subjects treated. We shall not discuss this contention. If it ever was sound, the revisions of 1868 and 1923 eliminated it.

The important ground of attack is that the statute is so indefinite and vague that it is unconstitutional, and in violation of the fifth and fourteenth amendments to the constitution of the United States and of the fifth and tenth sections of the bill of rights of the constitution of Kansas. Of course, if the statute is bad, the accusation under it is not good. (*Lanzetta v. New Jersey*, 306 U. S. 451, 59 S. Ct. 618, 83 L. Ed. 888.) Our attention is directed to *State v. Blaser*, 138 Kan. 447, 26 P. 2d 593, where this court quoted approvingly from *Connally v. General Cons. Co.*, 269 U. S. 385, 46 S. Ct. 126, 70 L. Ed. 322, to the effect that a criminal statute which forbids the doing of an act in terms so vague that men of common intelligence must guess at its meaning and differ as to its application, is not good, and where it was held:

" 'That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law.' (p. 391.)" (p. 448.)

The Blaser case, as well as the Connally case, involved construction of statutes pertaining to payment of wages to laborers under similar statutes. The offenses denounced were new offenses·as distinguished from offenses at the common law.

The question of unconstitutionality for vagueness and uncertainty was again before this court in *State v. Rogers*, 142 Kan. 841, 52 P. 2d 1185, where a statute with reference to unlawful allowance of claims against the county was invoked. (G. S. 1935, 19-242.) In that decision many cases bearing on the question are noted. We need not review the decision fully. This court held that the use of the phrase "according to the legal or *ordinary* compensation or price" etc., was not so vague or indefinite as to subject the statute to condemnation as being unconstitutional, the word "ordinary" being held to have a common and accepted meaning. The same question raised in the Rogers case was before this court in *State v. Millhaubt*, 144 Kan. 574, 61 P. 2d 1356, and the ruling in the Rogers case was adhered to. A petition for writ of certiorari to the supreme court of the United States was denied in *Millhaubt v. Kansas*, 301 U. S. 701, 57 S. Ct. 931, 81 L. Ed. 1356, and a rehearing was denied in 302 U. S. 773, 58 S. Ct. 5, 82 L. Ed. 599.

The depositing of false and fraudulent ballots, and the commission of acts and conduct which interfered with the freedom and purity of elections was punishable as a crime at common law. (See 20 C. J. [Elections, § 396] p. 274.) While it has been held in this state that there are no common-law offenses and there can be no conviction except for offenses defined by·statute (*State v. Young*, 55 Kan. 349, 40 Pac. 659), it must be recognized that we have many sections of our crimes act defining offenses, the certainty of which depends in part upon the fact the offense was known to the common law and that specification of detail is unnecessary. An instance is the statute with reference to abortion (G. S. 1935, 21-437), where that term is not defined, and whereby the means which may be used is not fully stated, but where intent to produce a certain result is the important element. This particular statute was under consideration in *State v. Miller*, 90 Kan. 230, 232, 133 Pac. 878, to which reference is made.

In 14 Am. Jur. (Criminal Law, § 19) pp. 773 *et seq.*, in a general discussion of the requisites of criminal legislation, and where the rule as to certainty is stated, it is said:

"A statute is not necessarily void for uncertainty because in creating a crime it does not define the offense, for if the offense is known to the common law, the common-law definition may be adopted, even in jurisdictions in which there are no common-law crimes." (p. 774.)

In discussing the creation and definition of crimes in general, it is stated in 16 C. J. (Criminal Law, § 28), p. 67, that—

"The legislature in creating an offense may define it by a particular description of the act or acts constituting it, or it may define it as any act which produces, or is reasonably calculated to produce, a certain defined or described result; or it may group together various means by which the end may be accomplished and make any one of such means an offense when done to attain the object denounced by the statute. In the absence of provision to the contrary, a statute may punish an offense by giving it a name known to the common law, without further defining it, and the common-law definition will be applied. In creating an offense which was not a crime at common law, a statute must of course be sufficiently certain to show what the legislature intended to prohibit and punish, otherwise it will be void for uncertainty. Reasonable certainty, in view of the conditions, is all that is required, and liberal effect is always to be given to the legislative intent when possible; but where the legislature declares an offense in words of no determinate signification, or its language is so general and indefinite that it may embrace not only acts commonly recognized as reprehensible but also others which it is unreasonable to presume were intended to be made criminal, the statute will be declared void for uncertainty. The certainty required may be accomplished, as we have seen, by the use of words or terms of settled meaning, or words which indicate offenses well known to and defined by the common law. It is not necessary to use technical terms, and the legislature may designate the offense by using words in common and daily use; and a penal statute is sufficiently certain, although it may use general terms, if the offense is so defined as to convey to a person of ordinary intelligence an adequate description of the evil intended to be prohibited."

In *State v. Friedlander*, 141 Wash. 1, 5, 250 Pac. 453, it was said:

"The next contention is that the statute under which the prosecution is had is in itself unconstitutional. The statute makes it a misdemeanor for any person to 'encourage, cause, or contribute to, the dependency or delinquency' of a minor child, but does not specify or define the particular act or acts which will constitute the offense. But, under the rule as we have hereinbefore announced it, the objection is not fatal. It is within the province of the legislature in creating an offense to define it by a particular description of the acts constituting it, or to define it as an act which produces a certain defined or described result. (*State v. Stuth*, 11 Wash. 423, 39 Pac. 665; *State v. Brown*, 108 Wash. 205, 182 Pac. 944.) The statute in question complies with the latter of these

principles, and is not insufficient because it does not define the acts which will produce the result denounced."

And, as bearing on the question, see *State v. Ireland*, 72 Kan. 265, 269, 270, 83 Pac. 1036.

There is no need to cite other authority. We are of opinion that the purpose of the statute was not so much to denounce certain specific acts as to prevent a certain result. We do not overlook the fact that there may be dispute as to what, in certain circumstances and under varying conditions, might be included within the phrase "any irregularity or fraud whatever." We do not have any doubt that what the legislature intended was to denounce the commission of any act done "with the intent to hinder, prevent or defeat a fair expression of the popular will" and by statute to declare that to be an offense which was an offense at common law. We do not believe the statute either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, nor that the statute should be held unconstitutional.

In order to discuss defendant's contention with respect to the admissibility of certain evidence it is necessary that an outline of the state's evidence be given. It may be remarked that we are here concerned with the election only insofar as the township officers are concerned. It was shown by the testimony of various witnesses, whose testimony in many respects was corroborated by that of the others, that the defendant suggested to witnesses Marshall and Grigsby and to one Walter Anderson, who was not a witness, that ballots be procured and marked for certain township offices and that the ballots be substituted at the election in 1936; that about 4 p. m. of the day before the election the township trustee brought to the house of Grigsby about 700 of each type of ballots to be used the next day, and that about 6:30 p. m. defendant came to the house, said there were too many ballots, and he had come after some, and he took six packages, of fifty ballots to the package, of the township ballots and took them away in his car. About 8 p. m. Anderson and Grigsby saw the defendant at Hotujac's garage, where Anderson left the car in which they were riding, and had a conversation with defendant. He then returned to witness' car and they followed defendant's car and went to Hotujac's house. In the kitchen of that house defendant and two others marked the ballots, cut the corners, folded the ballots and put them in a box. The shears used in cutting

the corners was a pair ten or twelve inches long. Afterwards the box was taken and put in Grigsby's car, and his car and defendant's car left. When witness' car reached the polling place, Anderson took the box and "went over the hill with it." The next day the election took place. The witness Grigsby testified he was a judge at the election, and with a pair of small scissors clipped the numbers off most of the ballots. During the day there was a box in the polling place with a coat or some cloth over it. It was not there when the polls opened but was there ten or fifteen minutes afterwards. During the day the township ballots were deposited in a box that had a clean top. About 5:30 to 6 p. m. there was a disturbance in the polling place. No one testified to seeing any switching of boxes, but there was evidence that when the polls closed the box containing township ballots and the ballots counted by the election board had a spot on its top. No complaint is made concerning the competency of the evidence which showed the above in much detail. Howard Thorn testified he was county clerk of Wyandotte county and that he had sent 750 township ballots, sealed in packages of fifty each, to the particular precinct; that about July 20, after the election, he had dumped the ballots returned by the various election boards from their original sacks upon the floor of the ballot room preparatory to destroying them; that on July 27 the attorney general, the county attorney and two helpers hunted out the ballots from the particular precinct, and got an order from the city court for their delivery to the county. attorney. His testimony tended to show the particular ballots and ballots from other precincts were not at the time separate and apart but were mingled together; some were still strung on wires or cords and some were not, and that it was necessary to hunt out the particular ballots wanted by the county attorney. His testimony disclosed the poll books showed 356 voters had been listed but showed a total vote of 393 cast for presidential candidates. He did not know whether all the township ballots had been found or not. The ballots found were placed in a vault and the next day delivered to the county attorney, who later delivered them to J. C. Shearman, a handwriting expert. Each of the various witnesses testified with respect to the safekeeping of the ballots. Our search of the abstracts does not disclose that either the county clerk, the county attorney or his secretary testified as to the number of ballots found or delivered, but Mr. Shearman stated there were 371 delivered to him. Mr. Shearman was called as an expert witness and

stated that he received the ballots, that he had studied and examined them; that he had made some particular pencil notations on different groups of the ballots so that he might identify them; he testified with respect to the way they had been folded, but more particularly that he found evidence the corners of the ballots had been cut in such manner as to indicate that two or more ballots were cut at the same time with the same action of the same shears or scissors. He also testified that the cuts were not smooth, but serrated, and that the serrations in various groups of ballots, as noted in his testimony, indicated that the particular groups had been cut in one single act. Without going into detail, he testified his examination disclosed some of the ballots had been clipped with the face exposed to the person acting and others had been clipped with the back of the ballot exposed to the actor. He also stated that the ballots at the place where cut or clipped indicated, from condition of the cut, that some were cut with dull scissors and some indicated they were cut with rather keen, sharp scissors. Each ballot had a separate exhibit number and the witness gave the numbers of ballots showing the above.

Defendant contends the trial court erred in permitting the ballots to be introduced in evidence for ten asserted reasons, none of which is supported by extended argument or citation of authority, further than to show the ballots would not be admissible in evidence in an election contest because at the time they were taken by the county attorney they were not in the same condition as when received by the county clerk immediately after the election, the citations in support being *Hudson v. Solomon,* 19 Kan. 177; *Ogg v. Glover,* 72 Kan. 247, 83 Pac. 1039, and *Getty v. Holcomb,* 79 Kan. 224, 99 Pac. 218. It must be remembered that in an election contest it is highly important that it be shown the ballots were properly preserved after being counted, and were so kept by the county clerk that no person was afforded any opportunity to tamper with them, so that in event of a recount as the result of an election contest, a wrong result might be reached. The case before us involves no rights of candidates at the election as to who received the greater number of votes. Here the evidence showed that the ballots were counted by the election board. The county clerk stated they were returned to his office and kept in a vault under his custody; that the six months he was required to keep them had expired and he was preparing to burn them when he received notice from the attorney

general not to destroy them, and that thereafter, under an order of court, they were delivered to the county attorney, whose testimony shows he carefully preserved them until they reached the possession of the witness Shearman. The purpose to be accomplished by the defendant and those charged jointly with him, assuming their participation in the matters charged, was accomplished when the fraudulent ballots were counted by the election board. It would seem preposterous in a case of the kind now under consideration to assume that after the ballots had been counted some person would then attempt to alter them to show the corners had been clipped in any particular manner. Nor do we think it material that in preparing to destroy the particular ballots, as well as others cast in other precincts at the same election, some of the particular ballots became loosened from the strings which bound them together. It was rather clearly shown they were all returned to the county clerk, as the statutes require. We are of opinion that the ballots were sufficiently identified as being ballots cast in the particular precinct. The only purpose they served was to form a basis for the expert testimony of the witness Shearman, and the credence to be given the whole matter was for the jury. The contention the ballots should not have been received in evidence is not sustained.

Defendant complains of the admission of the testimony of the witness Shearman. He first contends that Shearman was not qualified to testify as an expert. Not only did the witness testify to his previous studies and experience as a basis for showing his qualifications, but the record shows the defendant waived his qualification. It is contended, however, that the waiver was not complete. Admittedly the reasons for that contention are based on matters not of record, and we shall not consider that claim. Our examination of the record shows that the witness amply showed his qualification to testify as an expert, and the trial court did not err in permitting him to testify.

Complaint is also made concerning the conclusions reached by the witness from his examination of the ballots. We need not review the various contentions. All of them go to the soundness of the witness's deductions and the weight to be given his testimony. These were questions to be resolved by the jury, were resolved by it, their verdict was approved by the trial court and nothing is presented for appellate review.

Defendant also contends there was no evidence to sustain the

material allegations of the amended information that there was a substitution of ballot boxes and that fraudulent ballots were substituted for legal ballots, and that there was no evidence to sustain the verdict. We have outlined the state's testimony. Defendant's testimony, insofar as it pertains to the ballots, switching of boxes, etc., was limited to testimony of some election judges and clerks and other persons present at the polling place who were asked about their opportunity to see and know, that they saw and knew, of no substitution of boxes. The contention made is that the ballots and Shearman's testimony were both improperly admitted as evidence; that the testimony of various witnesses about procuring the ballots, marking them, etc., is neither reasonable nor creditable, and therefore there was a failure to prove defendant guilty. For reasons given in discussing other contentions, the complaint is not good.

It is next contended there was error in the instructions to the jury. No formal objection was made to any instruction when given, although with one exception hereafter noted the matter seems to have been raised on the hearing of the motion for a new trial.

Instruction No. 16 set forth the form of verdict to be used if defendant be found guilty, and included a part of the statutory language denouncing the offense. Instruction No. 17 set forth a much shorter form to be used if he be found not guilty. It is contended the first instruction was erroneous because the statute referred to was fatally defective, the same arguments being advanced as have been discussed in considering the constitutionality of the statute. What is said in that discussion answers the present contention and need not be repeated.

It is also contended the trial court gave an oral instruction to the jury, in violation of the statute and to defendant's prejudice. Defendant admits no objection was made to the trial court when the alleged instruction was given, nor called to its attention on hearing of the motion for a new trial. *State v. Hathaway*, 143 Kan. 605, 56 P. 2d 89, cited by defendant is not in point. The record contains no reference to any part of the matter and it cannot be considered.

Some complaint is also made of instruction No. 9 to the effect that one who counsels, aids or abets another in the commission of a criminal offense may be charged, tried and convicted as though he had committed the offense alone. The argument merely is the instruction was prejudicial, and is supported by no citation of au-

thority. We are of opinion that defendant was properly 'charged under G. S. 1935, 62-1016. Under *State v. Shenkle,* 36 Kan. 43, 12 Pac. 309, the instruction was proper. (See, also, *State v. Irwin,* 133 Kan. 509, 511, 300 Pac. 1098.)

The other instruction complained of is No. 8. Before discussing it in particular, attention is directed to other instructions of which no complaint is made. ` By instruction No. 1 the trial court fully informed the jury as to the nature of the charge against the defendant in the identical language used in the complaint as quoted above, with the exception the names of others than the defendant charged therein were not mentioned. By instruction No. 2 the jury was advised the defendant had entered a plea of not guilty, which put in issue "every ingredient of the crime charged in the information." Instruction No. 3 advised the jury as to the presumption of defendant's innocence, which went with him throughout the trial, and—

"He has the right to stand upon such presumption until every ingredient of the crime with which he stands charged has been proven by the evidence to your satisfaction beyond a reasonable doubt."

Instruction No. 8 was as follows:

"The material allegations of the information are in substance as follows:

"'1. That at the time and place alleged in the information, the defendant John Carr did, knowingly and willfully, commit an irregularity or fraud in connection with the general election held in precinct No. 1, Quindaro township, Wyandotte county, Kansas, on November 3, 1936; in that he marked and prepared a number of official ballots in such a manner as to make it appear that they had been marked and prepared for voting by the voters of said precinct; or did knowingly and willfully deposit said ballots, so marked and prepared, in a box resembling an official ballot box; *or* did knowingly substitute said box containing the ballots so marked and prepared for the official ballot box containing the ballots voted by the voters of said precinct at said election; *or* did knowingly and willfully substitute the ballots so marked and prepared for the ballots voted by the voters of said precinct at said election.

"'2. That the said defendant John Carr did, at said time and place, commit such irregularity or fraud with the intent to hinder, prevent or defeat a fair expression of the popular will, that is, the will of the voters of said precinct, at said election.'

"Therefore, unless *each and both of said material allegations* of the information have been proven by the evidence to your satisfaction beyond a reasonable doubt, you cannot convict the defendant, and should find him not guilty; but, on the other hand, if you do find from the evidence beyond a reasonable doubt, to your satisfaction, *that each and both of said material allegations*

have been proven, it will be your duty to find the defendant guilty of knowingly and willfully committing an irregularity or fraud in the general election held in precinct No. 1, Quindaro township, Wyandotte county, Kansas, on November 3, 1936, with intent to hinder, prevent, or defeat a fair expression of the popular will at said election, as charged in the information." (Italics supplied.)

Defendant's contention is this: That he had attacked the amended information on the ground that it charged four separate offenses in one count, and his attack failed because the trial court ruled that only four elements in one offense were charged; that the effect of the use of the word "or" instead of the use of the word "and," as in the complaint, was to permit some of the jury to find him guilty of one element, others to find him guilty of other elements, and permitted a verdict against him where all of the jury did not find him guilty of one and the same element, and that the consequence of the instruction was that he stood charged with four offenses. In support he cites *State v. Green*, 104 Kan. 16, 177 Pac. 519. In that case an information in one count charged unlawful delivery of consignments of intoxicating liquors to persons other than the consignees, and in a second count charged that on divers days and times defendant made delivery of liquors to one certain firm. This court held the information bad for duplicity. Here the information did not charge separate offenses, but a series of elements of one offense— prevention of a fair expression of the popular will at an election. In its instructions it is indispensable the trial court state the essential elements of the offense charged (*State v. Lynch*, 86 Kan. 528, 121 Pac. 351), although it is no objection the exact words of any statute are not used (*State v. Ireland*, 72 Kan. 265, 83 Pac. 1036). In *State v. Johnson*, 85 Kan. 54, 116 Pac. 210, it was said:

"In an information it was charged that the appellant 'did . . . entice, decoy, take and receive one Bertha Cary, a female child under the age of eighteen years, to wit, of the age of sixteen years, into a certain house of ill fame and disorderly house for the purpose of prostitution,' etc. A trial resulted in a conviction, and appellant insists that the information was bad because of duplicity and uncertainty, in that it charged more than one offense in one count, and that her motion to quash should have been allowed. The general offense charged was getting a female child into a bawdy or disorderly house for the purpose of prostitution. (Laws 1889, ch. 104, § 2, Gen. Stat. 1909, § 5137.) This may be done by enticing, decoying, placing or receiving the child into the house named for the purpose mentioned. The person who does one of these things commits an offense, or if all the things are done by him in one transaction he commits only a single offense and incurs but a single

penalty. It was proper, therefore, to charge all of them conjunctively in a single count. It has been decided that:

" 'Where an offense charged may be committed by two different means, and as several acts connected with and forming part of a general offense may be stated in a single count, its commission by both means may be charged in one count of the information, and proof of either will sustain the allegation.' (*State v. Hewes,* 60 Kan. 765, syl. ¶ 1.)" (p. 55.)

As has been shown, the information set forth certain elements of the crime charged. In *State v. Sherman,* 81 Kan. 874, 107 Pac. 33, it was held:

" 'Where the statute makes either of two or more distinct acts connected with the same general offense, and subject to the same measure and kind of punishment, indictable separately and as distinct crimes, when each shall have been committed by different persons and at different times, they may, when committed by the same person and at the same time, be coupled in one count as constituting all together one offense only. In such cases the offender may be informed against as for one combined act in violation of the statute, and proof of either of the acts mentioned in the statute and set forth in the information will sustain a conviction.' (*The State v. Schweiter,* 27 Kan. 499.)" (Syl. ¶ 4.)

This holding was approved in *State v. O'Donnell,* 116 Kan. 182, 185, 225 Pac. 1078, and *City of Great Bend v. Shepler,* 109 Kan. 568, 572, 201 Pac. 78.

In *State v. Robinson,* 124 Kan. 245, 259 Pac. 691, it was held:

"The amended information which set out with much particularity the facts whereby defendant and two coconspirators obtained five successive sums of money from the prosecuting witness by the continuing use of the same fraudulent scheme founded upon a tissue of false pretenses to which details were superadded as the fraud progressed did not necessarily constitute more than a single criminal offense and defendant's motion to quash was properly overruled." (Syl. ¶ 3.)

A somewhat analogous case, involving the question of claimed duplicity, was considered in *State v. Clark,* 125 Kan. 791, 266 Pac. 37, where the defendant was charged in a single count with persuading a female person to go from one place to another for immoral purposes, and it was held the gist of the offense was getting the woman to go, and the fact several changes of residence or short journeys were shown did not make a case of duplicity nor did the state have to elect upon which particular change of residence or trip it relied.

It has been repeatedly held that in a criminal prosecution the instructions are to be considered in their entirety; that an inaccurate

expression in one instruction may be cured by accurate statements in others, and that there is no reversible error where the instructions as a whole are correct, although parts standing alone are improper. (See cases collected in West's Kansas Digest, Criminal Law, § 822, and Hatcher's Kansas Digest, Criminal Law, § 295. And see *State v. Brown,* 145 Kan. 247, 65 P. 2d 333, where it was said:

"The rule is that an instruction given to a jury must be considered in connection with all the other instructions in the case. (*State v. Millhaubt,* 144 Kan. 574, 61 P. 2d 1356.) Where it appears, as it does in this case, that the instructions taken as a whole fairly cover the issues, there is no ground for complaint. An erroneous instruction may be rendered harmless by the other instructions given. (*State v. Gregory,* 74 Kan. 467, 87 Pac. 370; *State v. Killion,* 95 Kan. 371, 148 Pac. 643.) After a careful examination of the evidence in the light of all the instructions given to the jury, we do not think this one instruction was prejudicial to the defendant. (*State v. Kane,* 114 Kan. 426, 219 Pac. 281; *State v. Bolton,* 111 Kan. 577, 207 Pac. 653.) Not every error justifies reversal of a judgment. We are admonished by the statute that the error must be one which causes substantial injury to the rights of the party complaining. (G. S. 1935, 62-1718.)" (p. 251.)

It would seem to follow that if the state has to make no election as to the elements of a single offense there would be no error in the trial court's submitting them to the jury in the same manner as was done here. In the case at bar the testimony stood undenied that defendant proposed to others that they procure, mark and substitute ballots for the township offices; that he did procure the ballots; that they were marked, clipped and deposited in a box, all in pursuance of his proposal. That evidence is positive. The circumstantial evidence about the ballot boxes being interchanged is persuasive, and the expert testimony leads to a conclusion the entire plan was carried out. In order to convict, the state did not have to show that defendant personally did each of the several acts. Although he was tried alone, he was charged jointly with others, and what any of them did in carrying out the plan was in furtherance of it, and as was approvingly quoted in *State v. Wolkow,* 110 Kan. 722, 205 Pac. 639, 42 A. L. R. 265: "That which a person does by another, he does himself." (p. 725.) We do not think instruction No. 8 is erroneous for reasons urged against it. From the record and the entire instructions it is clear the jury were advised the defendant was charged with committing a fraud or irregularity with intent to defeat a fair expression of the popular will at an election, the elements of the fraud or irregularity being set forth, and that they were likewise advised the state had the burden of proving every

ingredient of the crime charged before there could be a conviction. If it be assumed the eighth instruction was subject to criticism in any particular, the fact still remains that the instructions, taken as a whole, correctly advised the jury as to defendant's rights and its duties in the premises. There is no showing there was an error affecting the substantial rights of the defendant.

Defendant also complains that he was not afforded a fair opportunity to present his motion for a new trial. The verdict was returned November 4, 1938, and the motion for a new trial was filed November 9. It came on for hearing on December 3, and that hearing was continued to December 6. Defendant sought a further continuance, contending he had not had time to subpoena certain jurors to testify. The trial court evidently thought ample time had been allowed and that appellant could or should have obtained affidavits, and it refused a further continuance. Appellant then dictated into the record a statement of what his proposed evidence would be. The trial court thereafter denied the motion. It appears to us the trial court's ruling refusing further continuance was proper. Other contentions concerning a new trial are in connection with matters heretofore discussed. The trial court did not err in denying the motion for a new trial.

The judgment of the lower court is affirmed.