No. 34,431

THE STATE OF KANSAS, *Appellee*, v. C. T. EDWARDS, *Appellant*.

(99 P. 2d 836)

Opinion filed March 9, 1940.

*John E. Wheeler*, of Marion, for the appellant.

*Jay S. Parker*, attorney general, *Guy Neal*, county attorney, *E. C. Wilcox* and *J. Howard Wilcox*, both of Anthony, for the appellee.

The opinion of the court was delivered by

THIELE, J.: Defendant was convicted of a violation of a criminal provision of the statutes with reference to banks and banking (G. S. 1935, 9-140).

He was tried on an information containing two counts. In the first count it was charged that on November 15, 1937, one J. R. Goodan, the assistant cashier and managing agent of the Corwin State Bank, a banking corporation located at Corwin, Harper county, Kansas, conspiring with and aided and abetted by one E. G.

Gillen and the defendant Edwards, unlawfully, feloniously, knowingly and willfully abstracted, misapplied and converted to the use of all three of them moneys, funds, securities and credits of the Corwin State Bank in the sum of $3,000 with intent to injure and defraud that bank. The second count was like the first, but charged an offense on November 24, 1937, in the amount of $450.

At his trial Edwards was convicted of both counts, his motion for a new trial was denied, and he appeals. We note that counsel representing him in this court did not appear for him at his trial in the district court.

Appellant first contends the trial court erred in overruling his motion to quash the information. The abstract does not show any motion to quash, nor does the only journal entry of judgment shown disclose any ruling. The state's brief does say that such a motion was filed but was never presented to the trial court nor ruled upon. The state of the record is not such that we can discuss the claimed error. (*State v. Clough*, 70 Kan. 510, 79 Pac. 117; *State v. Turner*, 114 Kan. 721, 220 Pac. 254.)

Appellant next contends the trial court erred in overruling his motion to compel the state to elect as to the several offenses attempted to be set forth in the two counts of the information. The abstract does not disclose any such a motion, nor any ruling on it. There is nothing for this court to consider. (*State v. Finney*, 141 Kan. 12, 28, 40 P. 2d 411.)

Although not next in order, we take up appellant's contention the trial court erred in its instructions to the jury. A careful search of the abstract and counter abstract fails to disclose either that the appellant requested the giving of any instruction or made any objection to the instructions that were given, nor are the instructions shown in the abstract. In the brief certain instructions and portions of others are quoted and criticized in view of appellant's version of what the evidence showed. The matter of claimed error in the instructions is not properly before us. We have, however, examined the complaints made. There is nothing fundamentally wrong with any of the instructions quoted in full. Where only excerpts are given, we discern no prejudicial error, although it must be noted that where the context with other parts of the same instruction and with other instructions does not appear, there is no sound basis for definite determination. As bearing on the whole matter, see *State v. Stiff*, 148 Kan. 224, 226, 80 P. 2d 1089; *State v. Linville*, 150 Kan.

617, 620, 95 P. 2d 332, and *State v. Carr,* 151 Kan. 36, 46, 98 P. 2d 393. The last case treats some of the contentions made in the present appeal.

Appellant also contends the trial court erred in the admission of evidence, and that the verdict is not supported by the evidence. Reference is made to considerable evidence concerning the admission of which complaint is made. We have examined the abstract and find that in only two instances was there any objection made in the trial court to the evidence now attacked. Where no objecttion is made to the admissibility of evidence in the trial court, there can be no review in this court (*State v. Greenburg,* 59 Kan. 404, 53 Pac. 61; *State v. Fox,* 116 Kan. 180, 225 Pac. 1042; *Snyder v. Rankin,* 120 Kan. 186, 243 Pac. 287; *State v. Netherton,* 133 Kan. 685, 690, 3 P. 2d 495). As is shown later, there was evidence that Gillen signed Edwards' name to two checks, one on the Burns State Bank, the other on the Peabody State Bank, and that these checks were worthless. The state called as witnesses officers of the two banks, who testified that Edwards did not have funds in either bank to meet the checks. Objection was made to questions eliciting that information. When it is remembered that Edwards, Goodan and Gillen were charged jointly and that the evidence tended to show a chain of circumstances leading up to proof of the unlawful taking of the $3,000 charged in the first count, and had the particular checks been authorized and honored, that would have tended to show lack of criminal intent, it is apparent that it was proper to show the checks were in fact worthless. As a matter of fact, that had been testified to by other witnesses and without objection. The testimony complained of was cumulative. Its admission in evidence was not erroneous.

Was the verdict supported by the evidence? The general rule is that in determining the sufficiency of evidence to sustain a conviction, this court looks only to evidence which is favorable to the decision, and if the essential elements of the charge are sustained by any legally admitted evidence, the conviction must stand. (See *State v. Wood,* 145 Kan. 730, 67 P. 2d 544.) With that rule in mind we summarize the evidence. No good purpose will be subserved by giving all of the details of the maze of financial transactions involved.

J. R. Goodan was the assistant cashier and the managing agent and officer of the Corwin State Bank in Harper county, Kansas. He

had known E. G. Gillen, who was a customer of the bank, for over three years.  Up to about September of 1937, Gillen's account was just an average active account.  Sometimes he was overdrawn for small amounts.  About that time Gillen's account became more active, and he was permitted to overdraw his account.  The first large overdraft that E. G. Gillen had at the Corwin State Bank was occasioned when he drew $900 to pay half of the purchase price of some bonds.  He turned this money over to Edwards or one Harsh with whom Edwards was dealing.  Later Gillen saw Edwards at Russell, Kan., and Edwards said he had been beaten out of the money. Gillen called up the Corwin State Bank and got $900 or $1,000 more. Later Gillen and Edwards went to Hutchinson, what happened there not being entirely clear from the record.  Thereafter on Gillen's order Goodan wired $3,100 to Kansas City to be used by Edwards in getting bonds from a Mr. Moore.  These bonds were never received by Goodan and Edwards.  While these events were transpiring, on October 25, 1937, E. G. Gillen assisted his brother in procuring from the Corwin State Bank a draft for $4,760, paying for the same with two checks which were not paid when presented for payment and were returned to the Corwin State Bank.  The giving of these checks formed the basis for the criminal prosecution of M. E. Gillen, whose appeal from conviction on one count is this day decided (*State v. Gillen*, ante, p. 359, 99 P. 2d 832).  About November 4, 1937, E. G. Gillen went to the Corwin State Bank and arranged for payment of the $3,100 item above mentioned and the two worthless checks given for the draft by depositing two checks, one on the Burns State Bank for $4,450 and one on the Peabody State Bank for $4,350, to both of which he signed Edwards' name, underneath which he placed his own initials.  These checks were not paid on presentation.  Before these last two checks which had been sent forward for collection could be returned, Gillen told Edwards what had been done, to which Edwards made no objection.  Gillen and Edwards were both aware that the series of transactions had caused or would cause a shortage of cash in the Corwin State Bank, and sometime prior to the time the two checks were returned unpaid they visited Goodan at his home in Hazelton, which is not far from Corwin, where the bank was located.

At that time they suggested that the Corwin State Bank approve by wire to the Union National Bank in Kansas City payment of a check for $5,000, that Edwards knew a man who had a chemical process by which money could be raised, and they would have the

money raised to larger denominations, and in that way funds to take care of overdrafts and shortages could be obtained. Goodan refused. The next day, November 15, 1937, Gillen and Edwards saw Goodan at the Corwin State Bank and they wanted $3,000. At first Goodan refused. Later Goodan agreed to O. K. a check at Cherokee, Okla., and Gillen and Edwards left saying they were going to Cherokee. Later Gillen and Edwards went to the Farmers & Merchants National Bank in Cherokee and as a result of telephone conversations and telegraphic advices between that bank and the Corwin State Bank, a draft was issued to Gillen. It was taken to Oklahoma City and cashed, Gillen receiving the payment. Gillen and Edwards then went to a hotel there and Edwards introduced Gillen to one Wilson, the reputed owner and manipulator of the chemical process for raising money. This process included putting the money in a press where it had to remain for some time. The three spent some time together. Gillen and Edwards went back later and got a package supposed to contain the raised bills. Later they opened the envelope and found "they had drawn a blank." Thereafter Gillen saw Goodan and told him the man got away with the money and they got nothing for it. Thereafter Goodan had demanded return of the money from Gillen. On November 24, 1937, Gillen and Edwards came to the bank and told Goodan they had some bonds, and if they would do him any good he could put them in the vault and maybe they would help out. The face value of the bonds was $6,000. Some of them were industrial bonds, some Texas oil bonds, and two, totaling $1,500, were registered. There was evidence tending to indicate some of the bonds were outlawed, some past due, and that all were of little value. They wanted $600 for the lot. They told Goodan the party who owned the bonds was waiting and they had to have enough cash to get them. Finally Goodan issued the bank's draft for $450 and took $4,500 face value of bonds, which never went into or became a part of the assets of the bank. The testimony showed the party waiting was Harsh, who with Gillen and Edwards took the draft to Cherokee, Okla., where it was cashed. From there they went to Anthony, Kan., where the funds were delivered to Edwards. We shall not detail any testimony showing the continued and close relationship between Edwards and Gillen prior to and during the times above mentioned, and their various conversations and visits with Goodan, nor the considerable testimony with respect to Gillen's overdrafts, and the amount of the shortages of

the bank from time to time. Appellant's contention the evidence does not support the verdict is based in part on evidence which contradicts the above and in part on his claim that certain evidence was incompetent. We have examined the complaint and have reached the conclusion that the evidence, a mere outline of which is given, does support the verdict.

There is also some contention that by reason of what transpired in the state of Oklahoma, the offense, if any, was committed there, and the venue was not in Harper county, Kansas. The record indicates this question was not raised in the trial court. It is too late to raise it here. (*State v. Shehi*, 125 Kan. 110, 263 Pac. 787; *State v. Toelkes*, 128 Kan. 293, 278 Pac. 20; *State v. Long*, 148 Kan. 47, 48, 79 P. 2d 837.)

It has not been made to appear that the trial court erred in the rulings above mentioned or in denying the motion for a new trial.

The judgment of the lower court is affirmed.